# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30296

United States Court of Appeals
Fifth Circuit

**FILED**
November 5, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

WALTER P. REED; STEVEN P. REED,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

Walter Reed served as District Attorney for Louisiana's 22nd Judicial District from 1985 to 2015. Federal prosecutors charged him and his son, Steven Reed,[1] with conspiracy to commit wire fraud and money laundering and substantive counts of both wire fraud and money laundering. Walter Reed also drew additional counts of wire fraud, false statements on income tax returns, and mail fraud. The jury convicted on all but one count, and both defendants

---

[1] When our discussion involves both appellants, we will refer to them by their full names. When it involves only one appellant, as in the case of the counts only charged against Walter Reed, we will refer to him as "Reed" where context makes the referent clear.

No. 17-30296

appeal. We vacate and remand the district court's imposition of joint and several liability for monetary forfeiture, but otherwise affirm.

**I**

The Reeds were indicted on nineteen counts.[2] While overlapping in certain ways, the counts fall into three categories.

The first set of counts were drawn from both defendants' use of Walter Reed's District Attorney campaign funds. The prosecution argued that Walter Reed solicited funds from donors on the premise that those funds would be used to facilitate his reelection, but instead used them for personal expenses unrelated to his campaign or the holding of public office—on multiple occasions, hiring Steven Reed to perform work at prices that did not correspond to the services provided. The defendants responded that each allegation had an innocent explanation.

Count 1 alleged that the Reeds conspired to engage in wire fraud and money laundering by funneling campaign funds to Steven Reed. The indictment described 21 overt acts on behalf of the conspiracy, linked to three distinct events. First, Walter Reed paid Steven Reed about $14,000 in campaign funds for producing an anti-drug service announcement worth only $2,000. Second, Walter Reed paid Steven Reed's company, Globop, about $550 for bar services at a "housewarming party" unrelated to the campaign.[3] And third, Walter Reed paid Steven Reed's other company, Liquid Bread, to provide "Bar Services: Beverages and Liquor" at a campaign event featuring the band America, the "America Event." The prosecution presented evidence that Liquid Bread only provided bar services and did not provide alcohol at the event, but that Walter Reed nonetheless paid Steven Reed $12 per person for 2,450

---

[2] The prosecution filed an eighteen-count indictment, amending to add a count.

[3] As we discuss, the district court ultimately declined to impose forfeiture on this payment.

2

No. 17-30296

people. The prosecution also alleged that Walter Reed suggested to two other companies providing services at the America Event that they each pay Steven Reed $5,000 out of the amount Walter Reed's campaign had paid them, but that he did not disclose either $5,000 payment on his campaign finance reports. After receiving payment from the America Event, Steven Reed paid down a loan for which Walter Reed was the guarantor and on which Steven Reed had begun to incur late charges. Counts 7, 9, and 10 alleged that both defendants committed wire fraud and money laundering related to the America Event.

Counts 2–6 and 8 dealt with Walter Reed's additional use of campaign funds for personal expenditures. The prosecution alleged that Reed spent campaign funds to purchase dinners, restaurant gift cards, and flowers—all for non-campaign purposes. It further alleged that he used campaign funds to pay for dinners with Pentecostal pastors and their families, then used those dinners to recruit referrals for the private legal practice he operated concurrently with his District Attorney service. As the prosecution explained, on one occasion, Walter Reed used campaign funds to host one of these dinners, requested that his firm reimburse him because he obtained a referral during the dinner, and then kept the reimbursement for himself until the investigation was underway.[4] It presented evidence at trial that the same pastor who gave Walter Reed the referral sought a "referral fee" in the form of a contribution to a church gymnasium, and after his firm declined to provide that fee, Walter Reed "donated" $25,000 of campaign funds for a church gymnasium.

The jury convicted both defendants of all counts related to use of Walter Reed's campaign funds, except for one money laundering count involving a $5,000 payment to Steven Reed at the America Event.

---

[4] Walter Reed contends that this was an inadvertent mistake.

3

The second broad category of counts, counts 11–14, alleged that Walter Reed underreported income on his tax returns, including for failing to report campaign funds he had converted to personal use. The prosecution contended that Reed owed the Internal Revenue Service about $40,000 in unpaid taxes. The jury convicted Walter Reed of all tax counts.

The final category of counts, counts 15–19, alleged mail fraud related to Walter Reed's representation of St. Tammany Parish Hospital. The prosecution presented evidence that the Hospital entered into a representation agreement with the District Attorney's office, but that from 1994 to 2014, Reed began depositing checks meant for the D.A.'s office into a personal bank account for a business entity he owned with his ex-wife, "Walter Reed Old English Antiques." It argued that the Hospital intended to enter into a relationship with the D.A.'s office, not with Reed in his personal capacity. The prosecution presented evidence that Reed was aware that the Hospital Board had repeatedly reaffirmed the *D.A.'s office*'s designation as special counsel, and that Reed sent another attorney from the D.A.'s office when he was unable to attend Board meetings. It also presented testimony that in response to press inquiries, Reed asked one assistant district attorney who often attended meetings in his place to sign a false affidavit that Reed offered to pay him to attend. Reed's defense was that there was a misunderstanding, and that he had been under the impression that the Hospital began retaining him in his personal capacity in 1994. The jury also convicted Reed of all mail fraud counts.

The district court sentenced Walter Reed to a below-guidelines term of imprisonment of 48 months, and Steven Reed to a below-guidelines term of probation. It ordered Walter Reed to pay a $15,000 fine and $605,244.75 in restitution. It also imposed forfeiture of $46,200 jointly and severally against both defendants, and of $609,217.08 solely against Walter Reed. In determining how much forfeiture to impose, the district court declined to

impose forfeiture for the "housewarming party" that the prosecution had identified as one of the 21 overt acts supporting the conspiracy count.[5] Because the court concluded that there was sufficient evidence of other overt acts to support the conspiracy charges, however, this affected the forfeiture amount but not the defendants' conspiracy convictions.

The Reeds raise several distinct issues on appeal. We reject all but one: the imposition of joint and several forfeiture liability.

## II

One of the principal arguments of the Reeds is that in prosecuting offenses drawn from misuse of Walter Reed's D.A. campaign funds,[6] the jury was asked to convict the Reeds of violation of campaign finance law, a denial of due process and "federalism."[7] We review here *de novo*,[8] and reject the contention.

The Reeds chiefly rely on the Supreme Court's decision in *McDonnell v. United States*,[9] which was issued after trial but before the district court denied the Reeds' post-trial motions for judgment of acquittal.[10] It called on the

---

[5] The district court concluded that the event appeared to have been "squarely political," since it was attended by Walter Reed's political supporters and he gave a speech or toast.

[6] This argument relates to counts 1–10 (alleging conspiracy and substantive offenses related to misuse of the campaign funds) and counts 11–14 (alleging false tax statements, in part through failure to report income diverted from the campaign funds).

[7] The district court limited references to state campaign finance law, concluding that they effectively alleged a scheme not charged in the indictment to defraud the public, not just donors, and the Louisiana Board of Ethics.

[8] *See, e.g.*, *United States v. Petras*, 879 F.3d 155, 166 (5th Cir. 2018) (explaining that we review *de novo* whether a federal statute permissibly covers certain conduct). Walter Reed frames this issue as raising due process and federalism concerns, and Steven Reed echoes the same points, though Steven Reed also appears to argue that this presents an issue for the sufficiency of the evidence. Through any of these lenses, our standard of review on the point is still *de novo*.

[9] 136 S. Ct. 2355 (2016).

[10] The district court allowed Walter Reed to file a supplemental memorandum to address *McDonnell*.

No. 17-30296

Supreme Court to interpret "official act" in the federal bribery statute 18 U.S.C. § 201—"any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."[11] The Court declined to read the definition broadly, determining that the phrase "official act" implicated only a limited set of decisions or actions "involv[ing] a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."[12]

Focusing on statutory text and precedent, the Court also noted "significant constitutional concerns" with a broader reading bringing a risk of "a pall of potential prosecution" over relationships between public officials and their constituents, reminding that it could not "construe a criminal statute on the assumption that the Government will use it responsibly."[13] Relatedly, the Court observed that "the term 'official act' is not defined 'with sufficient definiteness that ordinary people can understand what conduct is prohibited,' or 'in a manner that does not encourage arbitrary and discriminatory enforcement'"—implicating due process concerns.[14] And, finally, it identified "significant federalism concerns" attending a reading of "official act" that "involves the Federal Government in setting standards of good government for local and state officials."[15]

---

[11] While the relevant portion of the *McDonnell* charges involved honest services fraud under 18 U.S.C. §§ 1343 and 1349 and Hobbs Act extortion under 18 U.S.C. § 1951(a), the parties had agreed to interpret those statutes with reference to the bribery statute. *McDonnell*, 136 S. Ct. at 2365.

[12] *Id.* at 2371–72.

[13] *Id.* at 2372–73 (internal quotation marks omitted).

[14] *Id.* at 2373 (quoting *Skilling v. United States*, 561 U.S. 358, 402–03 (2010)).

[15] *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)) (internal quotation marks omitted).

No. 17-30296

While honest services fraud and the definition of "official act" in the bribery statute are not at issue here,[16] the Reeds argue that *McDonnell* does control; that as with the *McDonnell* prosecution's reliance on the term "official act," this case hinged on the interpretation of Louisiana campaign finance law's prohibition on the use of campaign funds for purposes unrelated to the campaign or the holding of public office.[17] The prosecution offered testimony from the CPA who prepared Walter Reed's campaign disclosure reports and from Kathleen Allen, Ethics Administrator and General Counsel to Louisiana's Board of Ethics.[18] It also offered testimony from Walter Reed's campaign contributors—alleged victims of the wire fraud—stating that they had expected their contributions to be spent on reelection activities.[19] The Reeds aver that these witnesses and the rest of the prosecution's strategy evidenced a prosecutorial reliance on what Louisiana campaign finance law did or did not prohibit, which was both unconstitutionally vague and inserted the federal government into enforcement of state law—in contravention of *McDonnell*.

The argument fails: to the extent that the prosecution pointed to Louisiana campaign finance law, it did so only to prove non-honest-services wire fraud and related offenses, a different context from *McDonnell*. The jury was tasked with determining whether the defendants committed simple wire

---

[16] Walter Reed suggests that the prosecution impermissibly reinfused honest services fraud into the case. As we will explain, the prosecution's evidence spoke to mens rea and donor expectations—not to the further question of whether Walter Reed violated campaign finance law or committed honest services fraud.

[17] *See* La. R.S. § 18:1505.2(I)(1).

[18] We discuss later in this opinion whether the district court improperly limited the testimony of a witness the Reeds offered to respond to Allen's testimony.

[19] One witness testified that he donated to Walter Reed's campaign fund "[t]o help him—support him to get reelected," and that he expected the funds to be used "[f]or reelection, signs, TV ads, rallies." Another witness testified she expected the funds to be used for "what campaigns usually do." A third testified that he expected the funds to be used "[j]ust for his campaign, advertisements."

No. 17-30296

fraud by defrauding Reed's donors.[20] The government was not required to prove that the defendants ran afoul of Louisiana campaign finance law, in contrast to *McDonnell*, where the troublesome concept of an "official act" was agreed to be an element of the honest services fraud and Hobbs Act charges.[21]

As a result, the Reeds' due process arguments are without merit. We agree with the district court that the conspiracy and wire fraud statutes at issue do not suffer the difficulties of "technical interpretation" of "official act," as in *McDonnell*; and so are unattended by its vagueness concerns.[22] Our recent decision in *United States v. Hoffman* is instructive. There, we reviewed convictions for wire and mail fraud related to filings and reports made in attempting to obtain state tax credits for film production.[23] We concluded that prosecution for those offenses did not raise vagueness concerns—"lying to cheat another party of money has been a crime since long before Congress passed the first mail fraud statute making it a federal offense in 1872."[24] In *Hoffman*, "[t]he government did not have to prove violations of state law," but

---

[20] The fact that the donors were alleged victims differentiates the Reeds' case from our decision in *United States v. Ratcliff*, 488 F.3d 639 (5th Cir. 2007), which involved a mail fraud conviction based on the defendant's procurement of loans to support his parish presidency campaign in violation of state campaign finance law. We held that the prosecution had not shown a scheme to defraud the parish just by showing that if the defendant had been reelected, he would have been eligible for financial benefits like a salary. *Id.* at 645. Since those financial benefits would have gone to the winning candidate regardless of who that candidate was, the defendant's activities could not be said to be part of a scheme to defraud the parish of money or property. *Id.* As the district court observed in this case, federalism was not the basis for *Ratcliff*'s holding or for the Supreme Court's holding in *Cleveland v. United States*, 531 U.S. 12 (2000), which the Reeds also cite.

[21] *See McDonnell*, 136 S. Ct. at 2365–66.

[22] *See United States v. Curry*, 681 F.2d 406, 410 (5th Cir. 1982) ("As a learned judge of this Circuit once remarked in regard to the mail fraud statute, '[t]he law does not define fraud; it needs no definition; it is as old as falsehood and as versatile as human ingenuity.'") (quoting *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir. 1941)); *accord United States v. Hoffman*, 901 F.3d 523, 541 (5th Cir. 2018).

[23] *Hoffman*, 901 F.3d at 531–36.

[24] *Id.* at 540. We observed that in contrast, the "honest services aspect of mail fraud" may permissibly give rise to vagueness challenges. *Id.*

instead, "[t]he elements the jury had to find included terms like misrepresentations and property that have deep roots in both criminal and civil law."[25] Here too, the jury was not called upon to interpret technical federal statutes or even elements of Louisiana's campaign finance law—it was asked to determine whether the Reeds had committed fraud.

We also conclude that the Reeds' prosecution did not impermissibly step on principles of federalism. *McDonnell* concerned a statute that, read broadly, might chill permissible official-constituent interactions.[26] While the Supreme Court's narrow reading was informed by a broader reading's challenge to principles of federalism,[27] it did not suggest that federal criminal law may never overlap with state regulation of governmental activity. We agree with the district court that "the federal government, in this case, enforced federal law—namely the federal fraud statute—and used state law only to prove *mens rea* and donor expectations."[28] While state governments certainly have "the prerogative to regulate the permissible scope of interactions between state officials and their constituents,"[29] those state officials simultaneously must

---

[25] *Id.* at 540–41.

[26] *McDonnell*, 136 S. Ct. at 2372 ("In the Government's view, nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*[;] and nearly anything a public official does—from arranging a meeting to inviting a guest to an event— counts as a *quo* . . . . [Under the Government's position, officials] might wonder if they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse."). Walter Reed urges similar concerns about a chilling effect on Louisiana politicians' use of campaign funds. As we explain, a candidate may present evidence of his or her understanding of state campaign finance law to support an argument that he or she lacked mens rea to commit fraud. Here, the jury evidently rejected Walter Reed's avowals that he lacked the requisite mens rea.

[27] *Id.* at 2372–73.

[28] As the district court observed, "[i]n this case, the jury heard a plethora of evidence, including evidence about Louisiana state campaign finance law, W. Reed's CFDA submissions, and testimony from donors and others who knew W. Reed. Ultimately, despite W. Reed's testimony and evidence suggesting his expenditures were, or he believed they were, legal and appropriate, the jury disagreed and found him guilty."

[29] *McDonnell*, 136 S. Ct. at 2373.

comply with federal fraud statutes.[30] In other words, if Reed's expenditures were legal under state law, the funding for the expenditures could nonetheless have been obtained fraudulently under federal law—and if Reed's expenditures were illegal under state law, the federal fraud prosecution did not substitute for any discipline under state campaign finance law.[31]

We pause to observe that our holding here is consistent with our fellow circuits' reluctance to extend *McDonnell* beyond the context of honest services fraud and the bribery statute, even where prosecutions involved local or state government officials.[32] This is not to say that the federalism or vagueness concerns raised in *McDonnell* could never have teeth beyond the specific

---

[30] We considered a similar issue in *United States v. Curry*, which in relevant part involved a defendant's mailing of false campaign finance reports. We recognized there that "[t]he same conduct could also give rise to charges of state law violations," but "the fact that a scheme may violate state laws does not exclude it from the proscriptions of the federal mail fraud statute." *Curry*, 681 F.2d at 411 n.11 (alteration omitted); *cf. United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007) (rejecting federalism concerns where "[t]he claims against [the defendant] were not predicated on any violation of state law" and "the jury instructions specifically cautioned jurors *not* to decide whether [the defendant] violated any state law, but to consider those laws only to the extent that the evidence indicated an intent to commit fraud on [the defendant's] part"). We do not read *McDonnell* or other cases to require otherwise.

[31] This point is born out in this case. Prosecution witnesses who had donated to Walter Reed's campaign testified that they had expected their donations to be used for *campaign* activities. The defendants argue that some of the expenditures, while not used for campaigning purposes per se, were nonetheless permissible under Louisiana law because they were related to the "holding of public office." While the defense elicited testimony from the prosecution donor witnesses that they solely expected their donations to be spent in accordance with Louisiana campaign laws, those same donors had previously testified that they expected their donations to be used toward typical political campaign expenditures. One donor denied that she solely expected her donation to be spent in accordance with state law, instead stating that "if you ask for money for a campaign, it should be used that way," regardless of state law. The wire fraud counts did not hinge on state law; instead, they hinged on whether the jury could determine fraud had occurred.

[32] *See United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (declining to apply *McDonnell* to prosecution under 18 U.S.C. § 666, which criminalizes theft or bribery concerning programs receiving federal funds); *United States v. Ferriero*, 866 F.3d 107, 128 (3d Cir. 2017) (declining to apply *McDonnell* to a state bribery statute that served as a predicate offense for a defendant's Travel Act and RICO convictions); *cf. United States v. Jackson*, 688 F. App'x 685, 695–96 nn.8, 9 (11th Cir. 2017) (observing that the issue was waived, but concluding that *McDonnell* did not apply to the same statute at issue in *Maggio*).

No. 17-30296

statutes *McDonnell* interpreted, but rather that *McDonnell* should not be taken to prohibit prosecution for any federal crime that overlaps or intersects with state law or local governance.

## III

The Reeds further raise a host of claimed errors in the district court's conducting of the trial. We will address the points of error, ultimately rejecting each of them.[33]

## A

Steven Reed contends that the district court should have severed his case from Walter Reed's, and Walter Reed contends that the district court should have severed the Hospital counts from the other counts. Federal Rule of Criminal Procedure 8 provides for joinder of defendants and offenses. Federal Rule of Criminal Procedure 14(a) allows a court to sever a trial if joinder appears to prejudice a defendant. "We review the denial of a motion to sever a trial under the 'exceedingly deferential' abuse of discretion standard."[34] Giving

---

[33] Walter Reed frames these issues as relevant to his constitutional right to present a complete defense. This requires him to show that "the excluded evidence is indispensable to the theory of defense; and the district court fails to provide a rational justification for its exclusion." *United States v. Kuhrt*, 788 F.3d 403, 421 (5th Cir. 2015). The Supreme Court has suggested that the right to present a complete defense is rarely violated when a court excludes defense evidence under a rule of evidence. *See Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (per curiam) (discussing state rules of evidence and distinguishing cases where a rule "did not rationally serve any discernable purpose" or "could not be rationally defended," or where the state "did not even attempt to explain the reason for its rule"). Because we conclude that the district court had rational justifications for excluding the relevant pieces of evidence, we also conclude that Reed's right to present a complete defense was not violated. *Cf. United States v. McGinnis*, 201 F. App'x 246, 252 (5th Cir. 2006) (per curiam) (holding that the right to present a complete defense was not violated where the district court concluded that proffered testimony would not assist the jury).

[34] *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017) (quoting *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009)) (discussing a motion to sever defendants); *see United States v. Mays*, 466 F.3d 335, 340 (5th Cir. 2006) (applying the abuse-of-discretion standard to a motion to sever counts).

the district court the deference due, we find no abuse of discretion in its denial of both defendants' motions to sever.

**1**

"[T]he federal judicial system has a preference for joint trials of defendants who are indicted together,"[35] and "[a] defendant is not entitled to severance just because it would increase his chance of acquittal or because evidence is introduced that is admissible against certain defendants."[36] We have held that "[m]erely alleging a spillover effect—whereby the jury imputes the defendant's guilt based on evidence presented against his co-defendants—is an insufficient predicate for a motion to sever."[37] Instead, a defendant "must prove that: (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration."[38] Severance is proper "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[39]

Turning to Steven Reed's trial with his father, he has not made the required showings. He argues that the joint trial prejudiced him because he was only charged in 4 of the 19 counts presented at trial and was prejudicially associated with Walter Reed's convictions on the other counts. But he has failed to establish that the district court's limiting instructions were

---

[35] *Chapman*, 851 F.3d at 379 (internal quotation marks omitted). Steven Reed does not allege on appeal that he was improperly charged in the same indictment as Walter Reed.

[36] *Burton v. United States*, 237 F.3d 490, 495 (5th Cir. 2000) (citing *Zafiro v. United States*, 506 U.S. 534, 540 (1993)).

[37] *Chapman*, 851 F.3d at 379 (internal quotation marks omitted).

[38] *United States v. Rodriguez*, 831 F.3d 663, 669 (5th Cir. 2016) (internal quotation marks omitted).

[39] *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007) (quoting *Zafiro*, 506 U.S. at 539).

inadequate protection against the harms he identifies.[40] The court directed the jury to consider each defendant's case separately and to give separate consideration to the evidence as to each defendant.[41] Steven Reed only offers a conclusory assertion that despite this instruction, the jury could not separately consider the evidence as to each defendant. This is not a showing that the district court abused its discretion.[42]

Steven Reed's other arguments for severance speak more to his ability to present a defense, and arguably could not be cured by a limiting instruction. He claims that he was prejudiced because his separate counsel was not conflict

---

[40] *See Rodriguez*, 831 F.3d at 669 ("[The defendant] must show that the instructions to the jury did not adequately protect him from any prejudice resulting from the joint trial." (alterations omitted)); *see also United States v. Matthews*, 178 F.3d 295, 299 (5th Cir. 1999) (considering limiting instructions similar to the ones offered here and holding that, "[a]ssuming without deciding that the Defendants' defenses were mutually antagonistic, the court's limiting instructions were sufficient to cure any prejudice").

Steven Reed points to our decision in *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012), where we reversed a district court's refusal to sever one police officer's officer-involved shooting trial from the trial of a set of other police officers who separately attempted to cover up the shooting. Unlike in *McRae*, the evidence presented against Walter Reed on the counts only pertaining to him (the tax return, mail fraud, and certain wire fraud counts) was not so inflammatory that the jury would find it highly difficult to dissociate it from Steven Reed's conduct. *See id.* at 828. Further, the charge and evidence against Steven Reed was significantly related to the charge and evidence against Walter Reed on the campaign funds counts, whereas in *McRae*, two sets of defendants were effectively being tried for two completely different offenses and the only link was that one offense was the "catalyst" for the other. *See id.* at 821–23.

[41] In relevant part, the district court provided the following instructions:

> A separate crime is charged against one or both of the defendants in each of the counts of the indictment. Each count and the evidence pertaining to it should be considered separately. The case of each defendant should be considered separately and individually. The fact that you may find one of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant.

[42] We generally presume that juries follow trial court instructions. *See, e.g.*, *United States v. Posada-Rios*, 158 F.3d 832, 864 (5th Cir. 2009).

free and declined to raise certain defenses that would have aided Steven Reed but put his father in a negative light.[43] As Steven Reed did not adequately develop this argument before the trial court, we will not hold here that the district court abused its discretion in denying his motion to sever.[44] He also claims that his father's testimony was a core portion of his defense, but that once evidence emerged in the trial of the Hospital counts that Walter Reed had asked an assistant District Attorney to lie on his behalf, Walter Reed's credibility as a witness was effectively impeached.[45] Here too, Steven Reed has not presented specific reason to believe that if the jury had not been aware of Walter Reed's alleged dishonesty related to the Hospital counts, it would have credited his testimony differently or reached a different outcome—he simply asserts without further explanation that Walter Reed's testimony was central

---

[43] Specifically, Steven Reed claims that he would have testified that his father told him what to put on the public service announcement invoice and instructed him how to respond to the reporter asking about whether he provided alcohol at the America Event, and that he believed the $5,000 payment he received from a caterer at the America Event was a tip for hard work, but that his attorney—who was hired by Walter Reed on Steven Reed's behalf—refused to voice these defenses.

[44] "The general rule in the Fifth Circuit is that Sixth Amendment ineffective assistance of counsel claims are not reviewed on direct appeal unless they were 'adequately raised in the trial court.' In order to provide competent review of such claims, the appellant must develop the record at the trial court." *United States v. Cervantes*, 706 F.3d 603, 621 (5th Cir. 2013) (quoting *United States v. Stevens*, 487 F.3d 232, 245 (5th Cir. 2007)) (internal citation omitted). Steven Reed filed a four-page affidavit with his motion for judgment of acquittal, stating that he had told his attorney information that would have exculpated him but negatively impacted his father's case, and that he urged the attorney to ask his father about these instances on cross-examination, but the attorney declined to do so. His sentencing counsel further raised this issue, but no further evidence was developed, such as through an evidentiary hearing.

[45] The crux of Steven Reed's argument here is effectively that the jury was exposed to extrinsic evidence of specific dishonest acts taken by Walter Reed, which otherwise would have been barred by Federal Rule of Evidence 608(b) if Walter Reed had simply been a testifying witness at Steven Reed's separate trial. This was not directly addressed by the limiting instruction; Steven Reed's argument on this point is not that the jury held his father's offenses against him, but rather that the most convincing evidence he had in his favor was his father's testimony, and the jury may separately have been compelled to conclude that his father was not credible.

to his defense, and that evidence emerging from the Hospital counts impeached that testimony. In sum, we cannot conclude that the district court abused its discretion in not severing Steven Reed's trial from all or part of Walter Reed's, especially given the strong preference for joint trials and the fact that joint trials have significant benefits that go beyond efficiency.[46]

## 2

Walter Reed, in turn, urges us to hold that the district court should have severed the Hospital counts from the other counts.[47] Joinder of counts is justified when there is "a series of acts unified by some substantial identity of facts or participants."[48] Because "[j]oinder of charges is the rule rather than the exception," in order to justify severance of counts a defendant must show "clear, specific and compelling prejudice that resulted in an unfair trial."[49] As with joinder of defendants, "the mere presence of a spillover effect does not ordinarily warrant severance."[50] The district court found that all of the counts in the indictment were properly joined because they were "part of a common series of transactions with a singular purpose—to exploit Walter Reed's influence as district attorney for personal financial betterment." It also found that "[t]o enrich himself, Defendant Walter Reed employed a singular means— fraud." Walter Reed alleges a general spillover effect whereby the prosecution conflated his alleged violation of the public trust in the Hospital counts with

---

[46] "Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

[47] In contrast, Steven Reed suggests that the court should have severed the campaign fund counts—the only counts under which he was charged—from the tax and Hospital counts. Because this is effectively an extension of his argument to sever defendants, we do not address it further.

[48] *McRae*, 702 F.3d at 820.

[49] *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995).

[50] *United States v. Simmons*, 374 F.3d 313, 318 (5th Cir. 2004) (per curiam).

No. 17-30296

his misuse of *non*public campaign funds in the campaign funding counts. But he has not adequately explained why, especially in light of the district court's limiting instructions to the jury to consider each count and the corresponding evidence on each count separately, he suffered "clear, specific, and compelling" prejudice resulting in an unfair trial. We conclude that the district court did not abuse its discretion in denying the motion to sever counts.

## B

The defendants contend that at trial, the district court made a series of erroneous evidentiary rulings. The district court did not abuse its broad discretion on these rulings.[51]

## 1

Both appellants contend that the district court improperly limited the expert testimony of Gray Sexton, a former Louisiana Board of Ethics general counsel.[52] The district court initially excluded Sexton's proffered testimony in its entirety, but later allowed Sexton to offer limited testimony in response to Kathleen Allen, a prosecution witness who testified to certain aspects of campaign finance law. The court observed that it had thought Allen would primarily explain aspects of Walter Reed's campaign finance reports, but because she ultimately testified to her opinions on what the campaign finance laws required, Sexton should be allowed to respond. The Reeds argue that further "custom and practice" testimony from Sexton was critical to demonstrate that Walter Reed had a good faith belief that he was in

---

[51] *See, e.g.*, *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018) ("This court applies a 'deferential abuse of discretion standard' when reviewing a district court's evidentiary rulings.'" (quoting *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016)).

[52] Only Walter Reed raised this issue before the district court, but Steven Reed adopts it in his briefing as part of his argument that if Walter Reed's conviction should be reversed, so too should his.

compliance with Louisiana law involving "dual purpose" campaign expenditures, so limiting Sexton's testimony also impermissibly limited their ability to present a defense.

A district court has "wide latitude" and "broad discretion" to exclude expert testimony.[53] We will not disturb the court's exercise of its discretion to exclude such testimony unless the exclusion was "manifestly erroneous"—that is, unless it "amounts to a complete disregard of the controlling law."[54] The district court found that Sexton's proffered "custom and practice" evidence about the Ethics Board's treatment of campaign fund expenditures was not relevant to Walter Reed's state of mind or other issues in the case, since there was no suggestion that Walter Reed had been aware of the facts on which Sexton would testify, and that Sexton's testimony would not help the jury understand the core issue of fraud.[55] We see no manifest error in the exclusion, especially because, as we have explained, this was not a trial of campaign finance violations.[56]

**2**

Walter Reed further argues that the district court erred in admitting certain statements by Steven Reed discussing the America Event. In 2014, Steven Reed was approached over a social networking site by a news reporter, who asked him whether he had the proper license to provide catering services to Louisiana political campaigns between 2009 and 2012. They conversed

---

[53] *See, e.g.*, *Williams*, 898 F.3d at 615 (alteration omitted).

[54] *Id.*; *see Kuhrt*, 788 F.3d at 418.

[55] *See* Fed. R. Evid. 702(a) (permitting expert testimony only if it will "help the trier of fact to understand the evidence or to determine a fact in issue"). For similar reasons, we conclude that Sexton's testimony was not "indispensable to the theory of defense," as Walter Reed would have to show in order to prove that the district court restricted his right to present a complete defense. *See Kuhrt*, 788 F.3d at 421.

[56] *Cf. United States v. Herzog*, 632 F.2d 469, 473 (5th Cir. 1980) (affirming the district court's decision to exclude a tax expert's testimony where it was not relevant to whether the defendant's tax crimes were willful).

online, and Steven Reed told the reporter that he did not require a catering license because he did not provide food or purchase or transport alcohol, but rather only provided bar setup services—including at the America Event. These statements were admitted in trial, apparently against both defendants. Walter Reed contends that under the Sixth Amendment's Confrontation Clause and *Bruton v. United States*, these statements could only be admitted against him if Steven Reed testified at the trial. While he raised other challenges to the admission of Steven Reed's statements before the district court, including that they were inadmissible hearsay as offered against him and that they violated other elements of the Confrontation Clause, he does not present those arguments here, and has therefore waived them on appeal.[57] We review alleged Confrontation Clause violations *de novo*, but subject to a harmless error analysis.[58]

The *Bruton* doctrine "addresses the thorny Sixth Amendment problem where one defendant confesses out of court and incriminates a co-defendant without testifying at their joint trial."[59] The Supreme Court held that in such a case, the declarant's confession presents such a "powerfully incriminating

---

[57] Arguably, Steven Reed's statements *were* inadmissible hearsay as offered against Walter Reed; while they appeared to come in under Rule 801(d)(2)(A)'s exception for party-opponent statements, that exception allows the admission of statements made or adopted *by the defendant* or made on his behalf, for example by a co-conspirator speaking in furtherance of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). Steven Reed's statements, made years after the America Event, could not be said to have been made on Walter Reed's behalf or in furtherance of their conspiracy, as would have been required under Rule 801(d)(2)'s exceptions to hearsay. But because Walter Reed does not present this issue in his briefing, we take him to have waived it. *See, e.g.*, *Willis v. Cleco Corp.*, 749 F.3d 314, 319 (5th Cir. 2014).

To the extent that Walter Reed argues a separate Confrontation Clause issue in his reply brief, we agree with the district court that Steven Reed's statements were not testimonial under the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004).

[58] *See, e.g., United States v. Ramos-Cardenas*, 524 F.3d 600, 606 (5th Cir. 2008) (per curiam).

[59] *United States v. Gibson*, 875 F.3d 179, 194 (5th Cir. 2017).

extrajudicial statement[ ]" that a limiting instruction alone cannot safeguard the co-defendant's Sixth Amendment rights.[60] But the Court has since clarified that *Bruton* applies only to facially inculpatory statements—and not to statements that only become inculpatory "when linked with evidence later introduced at trial."[61] It has explained that non-facially-inculpatory statements are less likely to inexorably steer a jury into disregarding limiting instructions, not to mention the practical impossibility of predicting in advance what statements might *become* inculpatory when coupled with other evidence presented at trial.[62]

We have some doubt about whether *Bruton* presents the appropriate lens for Walter Reed's objection,[63] but at a minimum, *Bruton* does not apply here because Steven Reed's statements did not facially inculpate Walter Reed. Steven Reed told the reporter that he had not provided alcohol at the America Event. For Steven Reed's statements to inculpate Walter Reed, the prosecution needed to link the statements to other evidence presented at trial: it had to prove that Walter Reed knew that his son did not provide the alcohol, and that a payment of $12 per person was not commensurate with the services that Steven Reed provided. Where there was this degree of attenuation between the

---

[60] *Bruton v. United States*, 391 U.S. 123, 135–36 (1968).

[61] *See Richardson*, 481 U.S. at 208; *accord Gibson*, 875 F.3d 179, 194–95 (5th Cir. 2017).

[62] *See Richardson*, 481 U.S. at 208–09.

[63] *Bruton* dealt with a statement that was only admitted against the declarant-defendant, but not against his co-defendant, as will often be the case when a statement is admitted as a party-opponent statement in a trial involving multiple defendants. *See Bruton*, 391 U.S. at 124–25. It does not prevent statements from being admitted against the non-declarant co-defendant when they are otherwise admissible. Here, the more central question appears to be whether the statement was directly admissible against Walter Reed in the first instance—that is, whether the statement was inadmissible hearsay as offered against him, or whether even if it was not inadmissible hearsay, admitting it against him violated his Confrontation Clause rights where Steven Reed did not take the stand. But Walter Reed raises neither of these issues on appeal, as we have discussed, focusing solely on the *Bruton* issue.

statement and its inculpatory value, introducing the statement did not violate *Bruton*.

Walter Reed raises other concerns about the introduction of the conversation, which we will not address in detail. We agree with the district court that, especially since the parties had previously stipulated to the authenticity of the documents, the district court did not err in allowing a Federal Bureau of Investigation financial analyst to read the record of the conversation out loud at trial.[64] As for the introduction of the reporter's statements in conversation with Steven Reed, the district court instructed the jury not to consider her statements for their truth, and Walter Reed offers no argument for why this limiting instruction was insufficient to cure any prejudice.[65]

**3**

Finally, Walter Reed argues that the district court prevented him from presenting a complete defense to the Hospital counts because it barred his proffered testimony about statements by deceased St. Tammany Parish Hospital Chairman, Paul Cordes. Reed had sought to testify and offer evidence about a conversation he had with Cordes in 1994, in which allegedly Cordes arranged for Walter Reed to represent the Hospital in his personal capacity rather than his capacity as District Attorney. The district court excluded this testimony as presenting inadmissible hearsay.

---

[64] *See United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) ("Once the proponent has made the requisite showing, the trial court should admit the exhibit in spite of any issues the opponent has raised about flaws in the authentication. Such flaws go to the weight of the evidence instead of its admissibility." (alteration omitted)).

[65] *See United States v. Jones*, 873 F.3d 482, 496 (5th Cir. 2017) (holding that when a defendant's statements on a phone call were admitted as party-opponent statements under Rule 801(d)(2)(A), "the other call participants' statements were admissible to provide context" (citing *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997)).

No. 17-30296

The first question is whether Cordes's statements were hearsay, that is, an out-of-court statement offered to prove the truth of the matter asserted.[66] We review *de novo* the district court's legal conclusion about whether a statement is hearsay.[67] Ordinarily, a statement is not hearsay if it is offered to prove the statement's effect on the listener.[68] Reed contends that he did not offer Cordes's statements to prove that Cordes actually arranged for him to represent the Hospital personally, but rather as evidence supporting his belief that he had begun representing the Hospital personally. The line was fuzzy, however, as to whether Reed truly sought to admit Cordes's statements solely to prove their impact on him, the listener, or whether he in fact sought to admit them for their truth. For example, after the district court excluded testimony about Cordes's statements, Reed attempted to offer the following statement, which the court directed the jury to strike: "It was my state of mind [that I was representing the Hospital in my personal capacity], and it was Paul Cordes'[s] state of mind too, I can tell you, from discussions with him." In light of the dual purposes for which Cordes's statements could have been wielded, we do not believe that the district court erred in concluding that Cordes's out-of-court statements were hearsay.

The issue was therefore whether the statements fell under an exception to hearsay, which Reed had the burden to establish.[69] He urges us to conclude

---

[66] *See* Fed. R. Evid. 801(c).

[67] *See French v. Allstate Indem. Co.*, 637 F.3d 571, 578 (5th Cir. 2011).

[68] *See, e.g., White v. Fox*, 470 F. App'x 214, 222 (5th Cir. 2012) (per curiam); *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 526 n.46 (5th Cir. 2001).

[69] *See* 30B *Federal Practice & Procedure Evidence* § 6803 (2018 ed.) ("The proponent of the [hearsay] statement, however, bears the burden of proving each element of a given exception or exclusion." (internal quotation marks omitted)). It is possible that Reed could have argued that Federal Rule of Evidence 803(3)'s exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)" applied to Cordes's statements, if those statements described Cordes's intention to secure or confirm Reed's individual representation for the Hospital. Because Reed did not argue this issue and the

that Cordes's statements should have been admitted under the residual exception to hearsay. We have been clear that the residual hearsay exception "is to be used only rarely, in truly exceptional cases,"[70] and that the "lodestar" of the exception is whether a hearsay statement has "equivalent circumstantial guarantees of trustworthiness" relative to other hearsay exceptions.[71] Reed contends that Cordes's statements had equivalent circumstantial guarantees of trustworthiness because his wife was prepared to testify that she participated in the conversation and other evidence corroborated that Reed had begun representing the Hospital in his personal capacity. This misunderstands the nature of the residual exception. As we have explained, "[t]he determination of trustworthiness is drawn from the totality of the circumstances surrounding the making of the statement, but it cannot stem from other corroborating evidence."[72] Reed has not carried his burden to demonstrate that the circumstances *surrounding Cordes's statements* generated circumstantial guarantees of trustworthiness adequate to support their admission.

---

parties have not briefed it, we do not consider it further, as Reed did not carry his burden of proving this hearsay exception.

[70] *United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005) (internal quotation marks omitted). "We will not disturb the district court's application of the exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached . . . ." *Id.* (internal quotation marks omitted).

[71] *United States v. El-Mezain*, 664 F.3d 467, 498 (5th Cir. 2011) (quoting *Walker*, 410 F.3d at 758).

[72] *El-Mezain*, 664 F.3d at 498 (internal quotation marks omitted). The operative question is not whether the jury would have reason to believe that the conversation occurred, or even whether the jury would have reason to believe that Cordes's statement was independently likely to be true. The residual exception requires a showing that because of the context in which the statement was made, the usual rationales for the hearsay exception—that there is no opportunity for contemporary cross-examination of the *declarant*, so there is no way to illuminate whether the *declarant*'s statement was mistaken or deliberately false—apply with less force than usual. In other words, the issue was whether the jury could trust the truth of *Cordes's* hearsay statements, not whether it could trust Walter Reed's recounting of those statements.

No. 17-30296

In any event, any error would have been harmless because the district court allowed Reed and his wife to testify extensively regarding Reed's reactions to the conversation. For example, Reed testified that "[a]fter a discussion with Mr. Cordes, [he] began attending the meetings in a personal capacity, and [he] began getting a check to Walter Reed." He further testified that he alerted the D.A. office manager that the D.A.'s office would no longer receive payment from the Hospital, and gave his office a memorandum to that effect. The district court also allowed Reed to introduce a letter, dated October 15, 1996, where he wrote to Cordes saying that while he had begun representing the Hospital two years prior, he had recently become aware that the board had never ratified his appointment as counsel. The letter attached a draft resolution for the Hospital Board to adopt; the defense also introduced a fax to Cordes's office dated October 21, 1996, also attaching a draft resolution. To the extent that Reed truly sought to introduce Cordes's statements to prove their impact on Reed as the listener, "the district court permitted [Reed] to elicit essentially the same (if not better) facts as those he originally proffered."[73] The jury's decision to nonetheless convict Reed on the Hospital counts is supported by the prosecution's contrary evidence that Reed was aware that the Hospital had never approved his appointment in a personal capacity, and that he sent members of the D.A.'s office to take his place at meetings without arranging for any additional compensation.

The district court did not commit reversible error in its conduct of the trial.

---

[73] *Gibson*, 875 F.3d at 193 (explaining that in such a case, there was no constitutional error in excluding evidence).

No. 17-30296

## IV

Walter Reed separately argues that prosecutorial misconduct presents grounds for reversing his conviction. Much of his argument centers on a claim that the prosecution effectively amended the indictment during trial. We conclude that Reed has not alleged any material variance, constructive amendment, or other prosecutorial misconduct that would justify reversal.

In discussing the Hospital counts, the indictment stated that

> [i]t was further part of the scheme to defraud that in order to conceal the fact that he was taking money and property from the Office of the District Attorney for the 22nd Judicial District for the State of Louisiana, Walter P. Reed reported the funds that he diverted as income on his 'Tier 2' personal financial disclosure to the Louisiana Board of Ethics, and, in all but one year, as gross receipts on his personal income tax returns.

Based on an adding tape produced a month before trial, the prosecution ultimately determined that Reed had paid taxes on his Hospital legal fees every year, but that there had been a different $30,000 discrepancy on his tax reporting in 2009. The government contends that regardless of where the $30,000 discrepancy came from, it had not been properly reported on Reed's tax returns.[74] At trial, the prosecution amended its exhibits to reflect that the missing $30,000 came from a different source, rather than from the hospital.

Reed now argues that the government's case impermissibly diverged from the indictment. He appears to frame this as a constructive amendment issue, but it is more appropriately addressed under the framework of material variance, which occurs "when the proof at trial depicts a scenario that differs

---

[74] While Walter Reed argues that this was a "CPA error mistaking a '4' for a '1,'" that argument was presented to the jury, but the jury evidently rejected it and convicted him on the relevant count.

24

materially from the scenario challenged in the indictment but does not modify an essential element of the charged offense."[75] The parties differ on what standard of review is appropriate, since Reed did not raise this argument until sentencing. We conclude that under any standard, Reed's claim fails.

We have held that "a variance between allegations and proof is fatal only when it affects the substantial rights of the defendant by failing to sufficiently notify him so that he can prepare his defense and will not be surprised at trial."[76] As the government explains, Reed's ability to prepare his defense was not hindered, because he was on notice of the prosecution's argument prior to trial and was aware of where the $30,000 discrepancy originated. The district court instructed the jury that any statements by the prosecution—including in the summary exhibits at issue here—were not themselves evidence that could support a conviction.[77] Any variance did not affect Reed's substantial rights.

Relatedly, Reed argues that the pattern of prosecutorial misconduct was so prejudicial as to warrant a new trial, and that the aggregation of non-reversible errors amounts to a constitutional violation and warrants reversal. He cites no legal authority for his arguments that the prosecution engaged in misconduct warranting reversal,[78] and we are not convinced that any

---

[75] *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011). In contrast, a "constructive amendment occurs when the government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment, or when the government is allowed to prove an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment." *Id.* (internal quotation marks omitted).

[76] *Id.* at 317 (internal quotation marks omitted).

[77] We presume "that a jury can and will follow an instruction that attorneys' statements are not evidence, unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." *United States v. Bennett*, 874 F.3d 236, 247 (5th Cir. 2017) (internal quotation marks omitted).

[78] *See United States v. Olguin*, 643 F.3d 384, 399 (5th Cir. 2011) ("[The appellant] fails to cite any authority for his argument; therefore, we conclude that he has waived this issue."). While Reed cites authority for his argument that prosecutorial misconduct would warrant

prejudicial prosecutorial misconduct occurred—especially not of the sort that satisfies Reed's "substantial burden" to prove reversible misconduct.[79] Even if we had concluded that Reed was correct on the legal and evidentiary issues we have discussed, he has not shown that the prosecution acted *improperly* in advocating for those rulings. As for his argument about cumulative error, having found no error with respect to Reed's claims, we also do not find cumulative error that would justify reversal.[80]

## V

Only Steven Reed directly challenges the sufficiency of the evidence for his conviction.[81] His argument partially hinges on claims Walter Reed advances, which we have already rejected. He also disputes, however, that the prosecution proved some of the 21 overt acts included in the indictment to establish the conspiracy count, and avers that the evidence did not sufficiently support that he committed wire fraud or money laundering connected to the America Event.

---

reversal, he does not provide us with legal grounds to reach the predicate determination that the prosecution in his case engaged in misconduct.

[79] *See Bennett*, 874 F.3d at 247.

[80] To prove cumulative error, a defendant must show that those errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness." *United States v. Oti*, 872 F.3d 678, 690 n.10 (5th Cir. 2017) (internal quotation marks omitted).

[81] Walter Reed did not raise sufficiency of the evidence as a ground for reversal in his opening brief, either in his statement of issues on appeal or in the full text of the brief. He argues in his reply brief that by stating that the district court should have granted his post-trial motions, he incorporated his sufficiency-of-the-evidence claims from before the district court. This was insufficient to preserve the issue. *See, e.g.*, *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) (holding that failure to adequately brief an argument in the opening brief waives the issue on appeal). Reed also argues that because he spent several pages in the "Statement of the Case" section of his opening brief refuting the overt acts that supported his conspiracy conviction, he preserved a challenge to the sufficiency of the evidence. This is similarly insufficient to indicate that he intended to preserve the challenge.

In any event, Reed solely presents *alternative* ways to interpret the evidence that convicted him, rather than showing that there was insufficient evidence to support the prosecution's interpretation. As we discuss in the context of Steven Reed's arguments, this is not enough to overturn a jury verdict.

No. 17-30296

We review the denial of a motion for acquittal based on the sufficiency of the evidence *de novo*, but will affirm "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict."[82] The jury, not we, evaluates the weight of the evidence and the credibility of witnesses.[83]

To prevail on the conspiracy count against Steven Reed, the prosecution needed to establish an agreement between the appellants to commit wire fraud or money laundering, an overt act committed by one of the conspirators in furtherance of the agreement, and the requisite criminal intent.[84] Contrary to Steven Reed's assertion on appeal, the prosecution was not required to prove that he actually committed the substantive offenses of wire fraud or money laundering.[85] While Steven Reed contests the sufficiency of the evidence on some of the 21 overt acts the prosecution presented,[86] all the prosecution needed to do was prove one of the overt acts in furtherance of the conspiracy. There was ample evidence for a rational juror to find beyond a reasonable doubt that Steven Reed agreed with his father to commit wire fraud and money laundering, that he intended to further the illegal purpose of that conspiracy, and that one of the defendants committed at least one of the overt acts.

---

[82] *United States v. Ragsdale*, 426 F.3d 765, 770–71 (5th Cir. 2005); *see United States v. Martinez*, 900 F.3d 721, 727–28 (5th Cir. 2018); *see also United States v. Isgar*, 739 F.3d 829, 835 (5th Cir. 2014) ("The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original)).

[83] *Ragsdale*, 426 F.3d at 771.

[84] *See United States v. Cessa*, 785 F.3d 165, 173 (5th Cir. 2015) (discussing conspiracy to commit money laundering); *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2008) (discussing conspiracy to commit wire fraud).

[85] *See United States v. Adair*, 436 F.3d 520, 525 (5th Cir. 2006).

[86] Specifically, he challenges the sufficiency of the evidence that he was overpaid for producing the public service announcement, which underpinned several of the overt acts.

27

No. 17-30296

The evidence was likewise sufficient for the jury to find beyond a reasonable doubt that Steven Reed committed the underlying offenses of wire fraud and money laundering. To prove wire fraud, the prosecution needed to show "(1) a scheme to defraud that employed false material representations, (2) the use of . . . interstate wires in furtherance of the scheme, and (3) the specific intent to defraud."[87] It produced evidence that Steven Reed knowingly accepted money from the campaign that was disproportionate to services he provided at the America Event, and that these funds were transferred using interstate wires. To prove money laundering, the prosecution needed to prove that Steven Reed knew that certain property represented the proceeds of unlawful activity and conducted a financial transaction involving those proceeds, knowing that the transaction was designed in whole or in part "to conceal or disguise" the nature, source, ownership, or control of the proceeds.[88] It produced evidence that Steven Reed was aware that the $5,000 he received from the caterer at the America Event was fraudulently derived from Walter Reed's campaign funds and that Walter Reed arranged for that transfer with the intent to obscure its origin.[89] We conclude that viewing the evidence in the light most favorable to the verdict, a reasonable juror could have credited the evidence presented as establishing beyond a reasonable doubt that Steven Reed was part of the charged conspiracy and that he committed wire fraud and money laundering.

* * *

---

[87] *See Hoffman*, 901 F.3d at 545 (explaining the elements of wire and mail fraud).

[88] *See* 18 U.S.C. § 1956(a)(1)(B)(i).

[89] While Steven Reed contests that the evidence showed that he personally intended to conceal the origin of the check, the prosecution did not need to prove that. *See Adair*, 436 F.3d at 524 ("To be guilty under [18 U.S.C. § 1956(a)(1)(B)(i)], a defendant need not have specifically intended to conceal or disguise the proceeds of the unlawful activity. It is sufficient for the defendant merely to be aware of the perpetrator's intent to conceal or disguise the nature or source of the funds.").

28

No. 17-30296

This concludes our review of the defendants' convictions. On appeal, the Reeds have extensively listed strengths in their cases and weaknesses in the prosecution's case. They have also pointed to discretionary determinations the district court made, ones that a different court may have perhaps resolved differently. None of this, however, convinces us that this able district court impermissibly erred in how it conducted the defendants' trial—or that the jury's ultimate decision to convict the defendants on almost all counts should be overturned. Finding no reversible error, we affirm the convictions.

## VI

We must separately consider the defendants' challenges to the district court's imposition of forfeiture. As we have described, the district court ordered forfeiture of $46,200 jointly and severally against both defendants for the conspiracy conviction under Count 1, and ordered forfeiture of $609,217.08 against Walter Reed for the wire and mail fraud counts.[90] We "review[ ] the district court's findings of fact under the clearly erroneous standard of review, and the question of whether those facts constitute legally proper forfeiture de novo."[91] The defendants raise three primary challenges to the fact and amount of forfeiture.[92]

---

[90] The government did not seek forfeiture for the tax offenses or money laundering counts.

[91] *Olguin*, 643 F.3d at 395.

[92] Walter Reed cites no authority for his argument that the government attorney bindingly limited the amount of forfeiture to a ten-year period by identifying a forfeitable sum reflecting ten years of legal fees in a pre-trial letter. We reject the suggestion that the prosecution may not seek changes to a forfeiture amount based on information that arises in trial. Other courts have permitted forfeiture of amounts not identified in an indictment "when the defendant has otherwise received sufficient notice of the forfeiture proceedings, the property sought to be forfeited, and the opportunity to defend against it." *See, e.g.*, *United States v. Diaz*, 190 F.3d 1247, 1257 (11th Cir. 1999) (collecting cases); *United States v. DeFries*, 129 F.3d 1293, 1315 n.17 (D.C. Cir. 1997) ("The government is not required to list all forfeitable interests in the indictment, provided the indictment notifies defendants that the government will seek to forfeit all property acquired [in the violation]."). Here, the indictment expressed intent to obtain forfeiture of proceeds traceable to violations of the

No. 17-30296

## A

First, Walter Reed argues that the district court should have only imposed forfeiture on the Hospital mail fraud counts related to offenses occurring within the five-year statute of limitations for mail fraud. We see no clear factual error in the district court's finding that Reed had engaged in a continuing scheme over 20 years, and no legal error in its conclusion that he could therefore be required to forfeit all of the proceeds from that scheme under 18 U.S.C. § 981 and 28 U.S.C. § 2461(c).[93]

Reed's reliance on the Supreme Court's decision in *Kokesh v. SEC*[94] is mistaken. *Kokesh* concerned the civil forfeiture statute 28 U.S.C. § 2462, and interpreted the language of that statute—which explicitly provides for a five-year limitations period on "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture."[95] By its terms, § 2462 governs *civil* forfeitures.[96] In contrast, here, forfeiture was imposed under 18 U.S.C. § 981

---

applicable laws, and Reed was on notice of the intended forfeiture prior to the hearing, allowing him to argue against the forfeiture of twenty years of legal fees prior to the forfeiture hearing.

[93] We have upheld forfeiture based on "a comprehensive criminal conspiracy" taking place over more than six years, even where the statute of limitations for the offense was five years. *See United States v. Wyly*, 193 F.3d 289, 303 (5th Cir. 1999). Other circuits have been more explicit in holding that forfeiture may be imposed on an amount that goes beyond the counts of conviction, as long as the property was obtained through the same criminal scheme. *See United States v. Venturella*, 585 F.3d 1013, 1015–17 (7th Cir. 2009) ("Furthermore, . . . forfeiture is not limited solely to the amounts alleged in the count(s) of conviction . . . . We have also interpreted other statutes authorizing forfeiture to include the total amount gained by the crime or criminal scheme, even for counts on which the defendant was acquitted."); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (distinguishing cases where forfeiture for uncharged and acquitted conduct was permissible because "the bases for the forfeiture orders [in those cases] were convictions for schemes, conspiracies, or enterprises" from a case where the funds were not traceable to such a scheme).

[94] 137 S. Ct. 1635 (2017).

[95] *Id.* at 1642 (quoting 28 U.S.C. § 2462).

[96] *See United States ex rel. Vaughn v. United Biologics, L.L.C.*, —F.3d— (5th Cir. Oct. 16, 2018) (explaining that the "series-qualifier" principle may allow "a single adjective . . . to modify a series of subsequent nouns or verbs" when context indicates that such a reading is intended, as when "the nouns and verbs are listed without any intervening modifiers").

and 28 U.S.C. § 2461(c). Section 2461(c) allows for criminal forfeiture when civil or criminal forfeiture is authorized for an offense and the defendant is convicted.[97] Because no specific statutory provision authorized criminal forfeiture on the fraud counts, the government therefore sought criminal forfeiture under § 2461(c) based on the civil forfeiture authorized under § 981. Reed identifies no case where a court has applied § 2462 or *Kokesh* to forfeiture under the provisions at issue in this case, neither of which incorporates the limitations provision in 28 U.S.C. § 2462 or imposes its own limitations period.[98] We conclude that the five-year limitations period at issue in *Kokesh* did not apply, and the district court was entitled to impose forfeiture on all proceeds from Reed's continuous criminal scheme—including those that fell outside the five-year limitations period for mail fraud.

**B**

Second, Walter Reed also argues that the forfeiture amount violated the Eighth Amendment prohibition against excessive fines. The Supreme Court has explained that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause [of the Eighth Amendment] is the principle of proportionality."[99] "If the amount of [a punitive] forfeiture is *grossly* disproportional to the gravity of the defendant's offense, it is

---

[97] *See* 28 U.S.C. § 2461(c). Here, the relevant civil forfeiture provision was 18 U.S.C. § 981, which allowed for civil forfeiture for mail fraud. "[A]lthough neither 18 U.S.C. § 981(a)(1)(C) nor 28 U.S.C. § 2461(c) expressly refers to personal money judgments, our sister circuits have uniformly agreed that personal money judgments are a proper form of *criminal forfeiture* under these statutes." *United States v. Nagin*, 810 F.3d 348, 353–54 (5th Cir. 2016) (emphasis added); *see also United States v. Vampire Nation*, 451 F.3d 189, 199–200 (3d Cir. 2006) (explaining that an earlier wording of § 2461(c) served as a "bridge" or "gap-filler" between civil and criminal forfeiture, "in that it permit[ed] criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized").

[98] Indeed, no case appears to have applied *Kokesh* in the context of 18 U.S.C. § 2461(c) or 18 U.S.C. § 981.

[99] *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

unconstitutional."[100] Here, the district court found that Walter Reed engaged in a twenty-year scheme to defraud by diverting payments meant for the D.A.'s office into his personal bank account. His offenses had identifiable victims—the Hospital, his constituents, and the D.A.'s office—and the money that he would forfeit came from those victims. The required forfeiture of $574,063.25 for the mail fraud offenses was not grossly disproportionate to the gravity of his offenses.[101]

## C

Finally, all parties propose that the district court's imposition of joint and several liability between the defendants for a forfeiture amount of $46,200—representing proceeds related to both defendants' convictions on the conspiracy count—should be vacated and remanded in light of the Supreme Court's decision in *Honeycutt v. United States. Honeycutt* held that joint and several forfeiture liability was not permitted for forfeiture under 21 U.S.C. § 853(a)(1), which mandates forfeiture for certain drug crimes.[102] The district court was aware that the *Honeycutt* decision was pending, but declined to postpone its ruling to wait for a decision, observing that we had previously held that joint and several liability was acceptable and that it was not clear that the Supreme Court's holding regarding 21 U.S.C. § 853(a)(1) would be binding on this case. Because the government has conceded that the imposition of joint and several forfeiture liability should be vacated and remanded in light of *Honeycutt*, we need not pick a side in the burgeoning circuit split over whether *Honeycutt* generally prohibits the imposition of joint and several liability for

---

[100] *Id.* at 337 (emphasis added).

[101] The facts of this differ from those of *United States v. Bajakajian*, where the only crime at issue was the failure to comply with a reporting requirement. *Id.* at 339.

[102] 137 S. Ct. 1626 (2017).

No. 17-30296

forfeiture imposed under 18 U.S.C. § 981(a)(1)(C).[103] We leave it to the district court to allocate the $46,200 in forfeiture between the two defendants.

## VII

We vacate and remand the portion of the district court's forfeiture order imposing forfeiture of $46,200 jointly and severally between both defendants, and otherwise affirm.

---

[103] *See United States v. Sexton*, 894 F.3d 787, 798–99 (6th Cir. 2018) (holding that *Honeycutt* does not apply to forfeiture under 18 U.S.C. § 981(a)(1)(C)); *United States v. Gjeli*, 867 F.3d 418, 427 (3d Cir. 2017) (holding that 18 U.S.C. § 981(a)(1)(C) is "substantially the same as the [statute] under consideration in *Honeycutt*"); *see also United States v. Carlyle*, 712 F. App'x 862, 864–65 (11th Cir. 2017) (per curiam) (remanding for the district court to determine whether *Honeycutt* governed wire fraud forfeiture under § 981(a)(1)(C), though observing that it appeared likely to apply).