REVISED September 21, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 18, 2009

Charles R. Fulbruge III
Clerk

No. 08-30586

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

DONALD SYLVESTER, also known as Big

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Donald Sylvester seeks to overturn his murder conviction, arguing that the district court erred in allowing the prosecution to use–in its case-in-chief–statements Sylvester made during failed plea negotiations, when he, as a condition to negotiations, knowingly and voluntarily waived his right to object to such use.

I

This case springs from a large-scale drug conspiracy in Houston and New Orleans that ended with the apprehension of all key members and the murder of a federal witness, Demetra Norse. At the time of her death in June 2003,

Norse was set to testify against a member of the conspiracy, Tamara Durand. Nearly a year later, the government obtained a warrant for the arrest of Sylvester for the murder. Soon thereafter, Sylvester voluntarily surrendered. Accompanied by his attorney at the time, Sylvester met prosecutors at the United States Attorney's Office in the Eastern District of Louisiana, and was advised of his Miranda rights and informed that he was under arrest for murder and various gun and drug charges. An Assistant United States Attorney, Maurice Landrieu, played an audio recording in which a member of the drug conspiracy, Terrance Lash, identified Sylvester as Norse's killer. (A jury later convicted Lash for arranging the murder.)[1] Landrieu also confronted Sylvester with a description of the killer and the killer's car from a 911 call, as well as evidence obtained during a pre-arrest search of Sylvester's car: cocaine, a newspaper that noted Norse's killing, and rap lyrics describing a similar murder.

Landrieu then explained that the Attorney General had the discretion to seek capital punishment for the murder of a federal witness, but proposed that, in return for a full confession that could be used against Sylvester in court if there were a trial, and cooperating in the case, Landrieu would ask permission from the Attorney General to seek life imprisonment instead.

After consulting with his attorney, Sylvester waived objection to the admission of incriminating statements at trial in the event that plea negotiations failed and the parties proceeded to trial. Landrieu made the promised recommendation to the Attorney General, but shortly after the

---

[1] Lash did not testify at Sylvester's trial because he later recanted his story, and pled not guilty at his own trial for arranging for Norse's murder. United States v. Terrance Lash, Criminal No. 03-135 (E.D. La.). At Sylvester's trial, the tape recording was played for the jury, but with a limiting instruction that it be considered only as probative of Sylvester's state of mind during the plea meeting, and not for the truth of the matter asserted.

meeting, Sylvester changed his mind, decided to go to trial, and requested new counsel, whom the court appointed.[2]

Pursuant to Federal Rule of Evidence 410, Sylvester moved to suppress statements he had made during plea negotiations. The district court conducted a full evidentiary hearing and, after post-hearing briefing, denied Sylvester's motion. In its order, the district court found Sylvester's waiver to be knowing and voluntary, and allowed the use of his plea statements in the government's case-in-chief.

With that order in hand at trial, the government introduced Sylvester's confession in its case-in-chief, as well as other evidence of his guilt including: descriptions of the killer matching Sylvester from two eyewitnesses; an eyewitness description of the killer's gold Ford sedan matching Sylvester's; records of numerous phone calls between Sylvester and Lash leading up to the murder, including one ten minutes before, as well as phone calls between the two later that night. The prosecution also introduced evidence of various items seized from Sylvester's car including photographs of him together with Lash, rap lyrics describing a murder similar to Norse's, a newspaper with an article describing recent local murders (Norse's among them), and cocaine. In addition, Durand, now a government witness herself, testified that Sylvester regularly purchased cocaine from Lash, dealt drugs, and was the heir-apparent to the conspiracy's New Orleans operations. Other drug conspiracy cohorts testified. For example, Shelton Roberts related that Lash called him after the murder asking to borrow his truck (phone records indicate this was two minutes after

---

[2] Landrieu then petitioned the Attorney General for permission to seek the death penalty. The petition was denied.

Sylvester had called Lash), and that after Lash returned with the truck, he told Roberts that Norse was dead. During the time Roberts said Lash was in his truck, phone records show that Lash made two calls to Sylvester.

Sylvester testified on his own behalf, disavowing involvement with the murder, while admitting to knowing Lash and trafficking "kilos" for him.

A jury convicted Sylvester on multiple felony counts, all stemming from the same factual matrix of murder and narcotics trafficking. The district court sentenced him to concurrent life sentences on seven counts, and concurrent terms of years on three others.

## II

Sylvester's appeal presents an issue of first impression in this court: whether the government may use a defendant's statements made in the course of plea negotiations in its case-in-chief, when the defendant, as a condition to engaging in negotiations with the government, knowingly and voluntarily waived all rights to object to such use.[3] The district court agreed with the government's contention that Sylvester's waiver is enforceable. Our review of this legal question is de novo.[4]

## A

---

[3] The parties agree that the statements at issue were made during plea negotiations and that Sylvester made them knowingly and voluntarily.

[4] Whether Rule 410 is waivable with respect to the use of plea statements in the government's case-in-chief is a legal conclusion, reviewed de novo. While the government is correct that a district court's admission of evidence, if objected to, is reviewed for abuse of discretion, de novo review of attendant legal issues is a component part of that abuse of discretion review. Koon v. United States, 518 U.S. 81, 100 (1996).

Ordinarily, under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f),[5] statements made by a defendant during plea negotiations are inadmissible at trial.[6] These Rules address both individual and systemic concerns in their attempt "to permit the unrestrained candor which produces effective plea discussions."[7] Most rights afforded criminal defendants, including these, are not inalienable, however. In the seminal case of United States v. Mezzanatto, seven members of the Supreme Court held that a criminal defendant can waive Rule 410 protection and make otherwise excludable plea statements admissible at trial "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily."[8] Notwithstanding this broad pronouncement, the Court in Mezzanatto upheld a more limited waiver than Sylvester's, one that allowed the government to use statements made in plea negotiations to impeach the defendant if he testified at trial, and five justices expressed doubt as to whether a waiver could be used to admit the defendant's statements in the government's case-in-chief. Two dissenters

---

[5] Federal Rule of Criminal Procedure 11(f) (formerly 11(e)(6)) is substantively identical and merely states that the admissibility of plea statements is governed by Federal Rule of Evidence 410.

[6] FED. R. EVID. 410 ("Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions: . . . (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.").

[7] FED. R. CRIM. P. 11 Advisory Committee's Note (1979) (internal citations omitted).

[8] 513 U.S. 196, 210 (1995).

disavowed waiver entirely,[9] while three justices concurred to raise the question of whether "a waiver to use such statements in the case-in-chief would more severely undermine a defendant's incentive to negotiate," thereby presenting a more pressing public policy justification for disallowing waiver.[10]

Now presented with a case-in-chief waiver, however, we can find no convincing reason for not extending Mezzanato's rationale to this case. Justice Thomas, writing for the Mezzanatto majority, set forth a framework for analyzing plea-statement waiver. He first discerned a "background presumption that legal rights generally, and evidentiary provisions specifically, are subject to waiver by voluntary agreement of the parties."[11] Thus, without affirmative indication that Congress intended to proscribe waiver of statutory protections, including evidentiary rules, voluntary agreements to waive these protections are presumptively enforceable.[12] As for Rules 410 and 11(e)(6), Justice Thomas found no indication of congressional disfavor toward waiver, either in the rules' text or in their attendant Advisory Committee's Notes.[13] Against this backdrop, Justice Thomas then explained that courts should examine the public policy justifications, if any, for departing from the norm. In Mezzanatto, he looked to

---

[9] Id. at 218 (Souter, J., dissenting) (expressing concern that a defendant who gives such a waiver "will be unable even to acknowledge his desire to negotiate a guilty plea without furnishing admissible evidence against himself then and there").

[10] Id. at 211 (Ginsburg, J., O'Connor, J., and Breyer, J., concurring).

[11] Id. at 203–04. Cf. 2 J. WEINSTEIN, ET AL, WEINSTEIN'S EVIDENCE par. 410[05] (1994). ("Rules 410 and 11(e)(6) 'creat[e], in effect, a privilege of the defendant.")

[12] Id.

[13] Id. at 208 n.5.

three potential rationales for overriding the presumption of waivability. He rejected each.

Perhaps chief among these concerns is the integrity of the judicial system. Yes, "[t]here may be some evidentiary provisions that are so fundamental to the reliability of the fact-finding process that they may never be waived," but, as Justice Thomas reasoned, "enforcement of agreements like respondent's plainly will not have that effect."[14] This is because "admission of plea statements for impeachment purposes enhances the truth-seeking function of trials and will result in more accurate verdicts."[15] When the prosecution seeks to enforce a waiver allowing it to use plea statements for impeachment, the defendant "[u]nder any view of the evidence . . . has made a false statement, either to the prosecutor during the plea discussion or to the jury at trial."[16] "[M]aking the jury aware of the inconsistency will tend to increase the reliability of the verdict without risking institutional harm to the federal courts."[17]

Nor is waiver at odds with Rule 410's goal of encouraging voluntary settlement, an argument that had persuaded the court of appeals. Mezzanatto cautions that focusing solely on the defendant's incentives to plead guilty, as the court of appeals did, "completely ignored the other essential party to the transaction: the prosecutor."[18] Even if waiver discourages some defendants from negotiating, "it is also true that prosecutors may be unwilling to proceed without

---

[14] Id. at 204.

[15] Id.

[16] Id. at 205.

[17] Id.

[18] Id. at 207.

it."[19]   Instead of precluding negotiation over an issue "[a] sounder way to encourage settlement is to permit the interested parties to enter into knowing and voluntary negotiations without any arbitrary limits to their bargaining chips."[20]

And, while defendants do face considerable pressure to plead guilty and to abandon many rights, Justice Thomas rejected the notion that waiver agreements invite prosecutorial overreaching and abuse.[21]  He explained that our criminal justice system presents many such loaded decisions for defendants–indeed the plea bargaining process necessarily exerts such pressure–and, absent specific evidence that the agreement was entered into unknowing or involuntarily, courts cannot infer abuse of prosecutorial bargaining power.[22]

Sylvester requests we draw a line between the waiver in Mezzanatto and his own.  His arguments, however, fail to convince.  Instead, Mezzanatto's reasoning lights upon little ground for finding an analytically coherent boundary between waivers for purposes of impeachment or rebuttal and waivers for the prosecution's case-in-chief.  At least four circuits, including the Second, Third,

---

[19]  Id.

[20]  Id. at 208.  A defendant may himself introduce his own plea statements, and indeed, the Rules themselves contemplate such a result in permitting the admission of statements made "in any proceeding wherein another statement made in the course of the same . . . plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it."  Id. at 205–06 (quoting FED. R. EVID. 410(i)) (emphasis added by Mezzanatto) (internal quotation marks omitted).  "Thus, the plea-statement Rules expressly contemplate a degree of party control that is consonant with the background presumption of waivability."  Id.

[21]  Id. at 210.

[22]  Id.

Seventh, and Ninth, already countenance rebuttal waivers, allowing use of a defendant's plea statements if the defendant presents any evidence at trial that contradicts his plea statements.[23] Going further, Justice Souter's Mezzanatto dissent (in which Justice Stevens joined) saw no principled limit to the Court's approach to waiver: "[i]f objection can be waived for impeachment use, it can be waived for use as affirmative evidence."[24] Whether a sincere statement, or rhetorical flourish, we agree with Justice Souter on that account–as do two sister circuits.

Of the pair, the D.C. Circuit's explanation is the more complete. (Although also countenancing a limitless waiver, the Eighth Circuit's opinion in United States v. Young asked only whether the defendant made it knowingly and voluntarily–ignoring any potential limits of Mezzanatto's holding–and does not provide this court with much persuasive pillaring).[25] In United States v. Burch, the D.C. Circuit analyzed and then discarded the two primary arguments Sylvester now presents for restricting Mezzanatto's reach: that it would undermine Congress's attempt to promote candid plea negotiations, in part because case-in-chief waivers will have a markedly greater impact on the

---

[23] What constitutes contradictory evidence varies by circuit and the language of a particular plea agreement. United States v. Hardwick, 544 F.3d 565, 570 (2008) (permitting waiver for rebuttal purposes); United States v. Velez, 354 F.3d 190 (2d Cir. 2004) (same); United States v. Rebbe, 314 F.3d 402 (9th Cir. 2002) (same); United States v. Krilich, 159 F.3d 1020 (7th Cir. 1999) (same).

[24] Id. at 217 (Souter, J. and Stevens, J., dissenting).

[25] 223 F.3d 905, 911 (2000). In an unpublished (and non-dispositive) opinion, this court has also enforced a waiver that "did not limit the government's ability to use [the defendant]'s statements" but this provision was only triggered on the defendant's breach, and the court relied in part on contract principles. United States v. Davila, 55 F.3d 632, 1995 WL 313937 (5th Cir. May 2, 1995).

willingness of defendants to participate in such negotiations; and that more expansive waivers undermine the reliability of the fact-finding process. Although Burch considered a somewhat distinct factual scenario in dismissing these arguments, we find both unavailing in Sylvester's case as well.[26]

B

Principal among Sylvester's claims is his assertion that allowing defendants to fully waive the protections of Rules 11(e)(6) and 410 would undermine the policy of encouraging plea bargaining. On a first look, this appears to have force; Congress accepted Rules 11(e)(6) and 410 with their goal of permitting candid plea discussions, serving personal as well as institutional interests. On closer inspection, however, we agree with Burch that "any argument relying on [congressional] intent [to promote candor] is too weak to justify refusing to allow use of . . . plea statement[s] in the government's case-in-chief."[27] Mezzanatto, for its part, explained that impeachment waivers do not undermine these efforts, and we see no reason why this rationale should not extend to case-in-chief waivers as well. Though "sanctioning waivers for the use of plea statements in the prosecution's case-in-chief, as opposed to impeachment or rebuttal, could have a markedly greater impact on the willingness of

---

[26] 156 F.3d 1315, 1322–23 (D.C. Cir. 1998) (considering statements made in the defendant's written plea agreement and during subsequent debriefing sessions as covered by the protections of Rules 410 and 11(e)(6) (now 11(f))).

[27] Id. at 1321.

defendants to participate in such negotiations,"[28] neither Sylvester nor case law has provided any supporting reason why this may be so.[29]

Instead, it seems unlikely to us that any significant number of defendants would draw fine distinctions as to whether statements made in the course of plea negotiations could be used in the government's case-in-chief or only for impeachment and rebuttal.[30] Even with such an exacting decisionmaker, the choice is somewhat illusory.

As both the Second and Seventh Circuits have observed, a rebuttal waiver might be worded so broadly as to allow admission of plea statements in the government's case-in-chief; in other words, "rebuttal" will sometimes mean the countering of factual assertions made during defense counsel's opening statement or cross-examination of government witnesses.[31] For example, in United States v. Barrow, the Second Circuit endorsed a rebuttal waiver that permitted introduction of the defendant's plea statements to contradict any factual assertions made by the defense at any stage of criminal prosecution, including during opening statements.[32] In Barrow, defense counsel's opening made it clear that his theory was one of mistaken identity, in the process pointing the finger at another putative suspect and triggering the rebuttal

---

[28] Id. at 1322.

[29] See id. (finding case law similarly unavailing).

[30] Cf. id.("Lacking any evidence to the contrary, it seems unlikely that most defendants would draw fine distinctions as to whether statements made in the course of or after the plea proceeding could be used in the government's case-in-chief or only in rebuttal.")

[31] United States v. Barrow, 400 F.3d 109, 117 n.7 (2d Cir. 2005); Krilich, 159 F.3d at 1025.

[32] Barrow, 400 F.3d at 114.

waiver.[33]  The Third Circuit has also held a rebuttal waiver activated on cross-examination of government witnesses, when the inquiries were "aimed at inferring" that others committed the crime, contrary to the defendant's plea statements.[34]

With a rebuttal waiver then, "a defendant can open the door to introduction of proffer statements as easily on the government's case-in-chief . . . . as on his own case."[35]  If a defendant opens this door during the government's case-in-chief and then "rests without presenting any direct evidence, the only opportunity the government will have to rebut the evidence elicited . . . will be on its direct case."[36]  This circumstance left the Second Circuit unconvinced that admission of plea statements in the government's case-in-chief necessarily constitutes error; rather, it determined that "the critical issues for purposes of determining admissibility should be whether defendant's waiver does explicitly apply . . . and whether he has, in fact, triggered the waiver."[37]

These sister-circuit approaches accord with our own treatment of so-called "similar act evidence."  Where it is apparent that the defendant will dispute the

---

[33]  Id. at 117.  Similarly, in his opening statement, Sylvester's attorney urged that his client had no involvement whatsoever in Norse's murder, instead claiming that another individual had been hired by Lash and committed the murder.  We decline to characterize this as triggering "rebuttal," however, because the government's incipient introduction of Sylvester's confession may have dictated this defense strategy, and in any event, the prosecution referenced the confession in its opening statement.

[34]  Hardwick, 544 F.3d at 571 ("One can otherwise present a position through arguments of counsel alone, [and] it is easy to see how a position can be presented by evidence developed on cross-examination and elaborated by counsel.")

[35]  Barrow, 400 F.3d at 117, n.7.

[36]  Id.

[37]  Id.

issue of intent, we allow the introduction of similar act evidence in the government's case-in-chief, even though it is normally only admissible on rebuttal.[38]

From this perspective, case-in-chief waivers serve two salient prosecutorial functions that broad rebuttal waivers cannot. First, case-in-chief waivers allow the prosecution to use the defendant's plea statements in an opening statement. Second, they admit plea statements even if the defendant limits his defense to credibility impeachment of government witnesses or essentially declines to wage any defense at all. These differences may well be cognizable in an abstract, ex post sense, but Sylvester has not convinced us that they have in practice or would in theory persuade any significant number of defendants to refuse a case-in-chief waiver, in favor of one limited to use in rebuttal.[39] That now, with the clarity of hindsight, he might wish for a different consequence, does not demand upending a knowing and voluntary agreement.[40]

---

[38] United States v. McMahon, 592 F.2d 871, 876 (5th Cir. 1979) ("But where it is evident at the outset that intent will be an issue at trial, we have held that admission of the extrinsic offense in the government's case in chief does not constitute grounds for reversal. Under the circumstances of this case where appellant, prior to trial, appeared before the Grand Jury and denied hiring Barboa and Avilucia to transport aliens appellant's defense could be anticipated and it was clear that intent would be an issue at trial.") (internal citations omitted).

[39] Krilich, 159 F.3d at 1025 (internal quotation marks omitted).

[40] See id. at 1026. (explaining, in the context of Rule 401 waiver, that "no party to a contract has Humpty Dumpty's power over language either directly or through the gambit that unanticipated consequences render the agreement 'involuntary'" and a "defendant's understanding of the consequences of his waiver need not be perfect" to be knowing and voluntary) (emphasis in original).

We acknowledge that Burch, and a few district court opinions to have relied on it,[41] involved waivers "executed as a result of plea negotiations" (whereas Sylvester waived his rights as a precondition to negotiations), and securing a waiver at a negotiation's outset might present a more difficult question.[42] That being said, any heightened concern about too severely undermining a defendant's incentives to negotiate is diminished by Mezzanatto itself, which also involved a waiver as a precondition to plea discussions. And, of course, Sylvester does not argue that he suffered any hesitation in pleading guilty with such a waiver; his hesitation, if any, arose only after he had obtained the benefit of his bargain. So to the extent Sylvester's waiver was of a personal right, it was complete.

C

As for Sylvester's second argument, which reaches for structural support—that refusing to allow case-in-chief waivers will enhance or protect the reliability of the fact-finding process—we are similarly unpersuaded. Sylvester's path would lead us farther from the truth, not closer. If anything, to ignore relevant evidence of culpability simply because that evidence was discovered during the course of plea negotiations would arguably undermine the truth-seeking function of our criminal justice system. While in theory an innocent defendant might execute such a waiver (and thus inject false statements into the admissible record), the benefit of evaluating as much relevant evidence as possible outweighs the mere possibility of such danger, and will, on balance,

---

[41] See, e.g., United States v. Mitchell, 2009 WL 1393138, (D. Utah May 18, 2009); United States v. El-Amin, 268 F. Supp. 2d 639, 642 (E.D. Va. 2003); United States v. Fabricius, 1996 WL 705888, *3 (N.D.N.Y. Dec. 3, 1996).

[42] Burch, 156 F.3d at 1322.

enhance the reliability of a fact-finder's conclusions.[43] Presumably a defendant who is actually guilty will still seek the benefit of his bargain, and remain candid even after making a waiver, lest his deception invalidate his bargained-for agreement.

## D

As Sylvester concedes, this is not a case of fraud or coercion; instead, he made the waiver knowingly and voluntarily in the presence of counsel, while obtaining the benefit of his bargain when the prosecutor requested a maximum punishment of life imprisonment.

Though we have no occasion to labor on this front, we pause briefly to note that Mezzanatto specifically encourages "case-by-case inquiries into whether waiver agreements are the product of fraud or coercion."[44] As obvious as this statement may be, we mention it only to cabin Sylvester's appeal from those of future defendants and make plain that we do not hold today that disparity in bargaining power will never render a plea-statement waiver involuntary.

While even "gross disparity" in relative bargaining power does not mean waiver is "inherently unfair and coercive,"[45] we are not prepared to say that rank difference in individual cases cannot render the defendant's plea involuntary. We acknowledge the proposition that "to the extent that there is a disparity

---

[43] See Mezzanatto, 513 U.S. at 204–05 (citing Note, Contracts to Alter the Rules of Evidence, 46 HARV. L. REV. 138, 142–43) (1933) ("[A] contract to deprive the court of relevant testimony. . . stands on a different ground than one admitting evidence that would otherwise have been barred by an exclusionary rule. One contract is an impediment to ascertaining the facts, the other aids in the final determination of the true situation.") (footnote omitted)).

[44] Mezzanatto, 513. U.S. at 210.

[45] Id.

between the parties' bargaining positions, it is likely attributable to the Government's evidence of the defendant's guilt," but also must note that this rule of thumb is not invariably true.[46] The hazard of an impulsive and improvident response to a seeming but unreal advantage might prove coercive, as might misrepresentations or manufactured evidence that overbear the will of the defendant with a meaningful defense. But nothing of the sort is alleged here, and given the die cast by Mezzanatto, we can find no reason to discern between the waiver countenanced in that case and Sylvester's.

Finally, despite the reality that allowing waiver in circumstances where the government could not prove one or more elements of an offense without the defendant's statement presents a distinct line for possible limitation of waiver, the argument is not made here and the sweep of Mezzanatto's language offers little hope for such line drawing by inferior courts—a line that only the high court can draw, in a case where the contention is made.

## III

Because Sylvester's statements made during plea negotiations were properly admitted at trial, we need not reach Sylvester's argument that, absent those statements, the government lacked sufficient evidence to convict him of the murder-related and gun possession charges. However, regardless of whether those statements were properly admitted, Sylvester also urges that "[t]here is not a shred of evidence" to support his cocaine conspiracy conviction.[47] We disagree.

---

[46] Velez, 354 F.3d at 196.

[47] Sylvester concedes that the government's evidence was sufficient to support his conviction for possession of cocaine.

Sylvester moved for judgment of acquittal on all counts at the close of the government's case-in-chief, and again at the close of evidence. So, we review the sufficiency of the evidence to determine whether a rational trier of fact could have found the essential elements of the conspiracy offense beyond a reasonable doubt."[48] We view the evidence in the light most favorable to the verdict.[49]

To convict a defendant of a drug conspiracy, a jury must find beyond a reasonable doubt an agreement that entails violation of federal narcotics laws, the defendant's knowledge of the agreement and intent to join it, and his voluntary participation in it.[50] There is no overt act requirement.[51] The jury may rely upon circumstantial evidence,[52] including evidence of presence and association, though those factors alone are insufficient to prove conspiracy.[53]

Durand testified that Sylvester was a regular customer of Lash's, and that she and Lash were planning on handing the conspiracy's New Orleans operations over to Sylvester (and another conspirator, Eddie Fatheree, confirmed that Durand and Lash were planning to do so). Sylvester himself, testifying at trial, admitted that he knew Lash and had distributed and trafficked cocaine for him. Although later attempting to re-cast his involvement as trafficking drugs

---

[48] United States v. Shum, 496 F.3d 390, 391 (5th Cir. 2007).

[49] United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd, 462 U.S. 356 (1983).

[50] United States v. Peters, 283 F.3d 300, 307 (5th Cir. 2002); United States v. Ayala, 887 F.2d 62, 67 (5th Cir. 1989).

[51] Peters, 283 F.3d at 307.

[52] Id.

[53] Id.; United States v. Lechuga, 888 F.2d 1472, 1477 (5th Cir. 1989).

from a city other than Houston (and thus apparently implying that he trafficked for a different conspiracy than the one charged), a rational trier of fact could still have found the essential elements of the offense beyond a reasonable doubt.

For these reasons, we find no error on any plane.

AFFIRMED.