# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 13, 2023

Lyle W. Cayce
Clerk

———————

No. 21-30501

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Chad Allen Scott,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CR-181-1

———————————————————

Before King, Jones, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

A federal jury convicted former law enforcement officer Chad Scott of multiple counts of falsifying government documents, obstruction of justice, perjury, and property conversion. Scott was sentenced to 160 months in prison. He appeals his convictions and sentence. We affirm.

## I. Background

### A. Facts

When he was an agent with the Drug Enforcement Administration ("DEA"), Chad Scott led a taskforce of local law enforcement officers that

No. 21-30501

targeted drug trafficking in the New Orleans Northshore area.[1] The core of this "Northshore Group" consisted of Scott, Karl Newman, Rodney Gemar, and Johnny Domingue. The team was successful in disrupting the drug supply chain, particularly by using informants. But at some point the officers themselves began breaking the law.

They started relatively small, stealing modest amounts of money or property from people they arrested. Their crimes escalated over time, though. For example, Scott once collected about $2,000 from seized wallets to fund a trip to Spain. The team also began skimming cash from drug busts. On one occasion, they seized $16,000 but declared only $5,900 to the DEA. On another, they seized $76,000 but declared only $47,000.

Scott also falsified documents in order to seize a truck from Frederick Brown, a dealer-turned-informant. Initially, he considered seizing Brown's limited-edition Ford F-150 before learning it had too many miles. Scott had an idea: he told Brown to buy a new Ford F-150 and hand it over to "show good faith." Brown complied and delivered the new truck to Scott at a gas station in Cypress, Texas on July 25 or 26, 2014.[2]

Scott drove the truck back to New Orleans, where he told Newman to doctor the paperwork. Newman declared that the truck had been seized at the DEA office in Louisiana, not at a Texas gas station. Scott then wrote in the probable-cause section that the truck was seized on July 28 after he met

---

[1] The Northshore refers to parishes just north of Lake Ponchartrain, including Tangipahoa and St. Tammany Parishes. The taskforce mainly worked in Tangipahoa Parish, roughly 40 miles north of New Orleans.

[2] Brown also left a Rolex in the glove box that he wanted "turn[] over" to Scott. During the handoff, Brown asked "how much it'll take for this case [against him] to go away." Scott replied that Brown "d[idn't] have enough money."

2

No. 21-30501

with Newman and Brown in Metairie, Louisiana.[3] The DEA later issued the truck to the Northshore Group as a service vehicle.

Scott also used Brown to suborn perjury. With Brown's help, the DEA arrested Edwin Martinez, who ran a drug-trafficking storefront in Houston. Martinez agreed to name his suppliers, including a heroin wholesaler named Jorge Peralta. After Peralta's arrest, Scott, Newman, and Domingue met Brown at a hotel bar. Scott showed Brown pictures of Peralta, but Brown did not recognize him.

Two months later, Brown was arrested in Louisiana on a separate drug charge. As Peralta's trial approached, Scott visited Brown in jail, pressing Brown on whether he knew Peralta. Brown finally got the drift. He asked to see another photo of Peralta and now stated: "Yeah, that's the little fat Mexican guy." Brown then implored Scott: "Just give me a chance. Put me on the case. I gotcha." Scott told Brown to bring his "A game" as a witness at Peralta's trial.[4]

Scott also pressured Martinez into testifying that Peralta and Brown had seen each other at Martinez's storefront. Although Martinez denied that happened, he agreed to say "whatever [Scott] want[ed]." At Peralta's trial, both Brown and Martinez testified that Peralta and Brown had seen each other. Scott himself testified that Brown mentioned he had seen Peralta at Martinez's shop. Peralta was convicted of conspiring to distribute cocaine and heroin.

---

[3] Scott also completed and signed a DEA-investigation report containing the same misrepresentations.

[4] When Brown later grew nervous that he would be unable to identify Peralta at trial, Scott sent Newman to show Brown more photos of Peralta.

No. 21-30501

Around this time, things began to go south for the Northshore Group. One member, Johnny Domingue, was arrested by state police for dealing cocaine. Fearing Domingue would turn on them, Gemar, Newman, and Scott scrubbed their office of incriminating evidence, including confiscated cellphones, wallets, and guns. Newman and Gemar threw the phones and some of the guns into a swamp. They turned in two other guns, both seized years earlier, to local police. Scott then used about $4,700 from the wallets to hire a lawyer for Domingue, but Domingue refused the representation.

Later that year, the FBI raided the Northshore Group's office. In Scott's cubicle, agents discovered wallets, driver's licenses, credit cards, 17 cell phones, and other personal effects belonging to individuals Scott had arrested.

## B. Prior Proceedings

Scott was arrested and later indicted on numerous federal charges. The district court split the charges into two trials. The first trial covered counts relating to the seizure of Brown's truck and the alleged subornation of perjury and obstruction of justice in Peralta's trial. The second was a joint trial of Scott and Gemar covering the alleged conversion of property.

In Scott's first trial, the jury deadlocked. On retrial, however, the jury found Scott guilty on two counts of falsification of government records, in violation 18 U.S.C. § 1519; three counts of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and two counts of perjury, in violation of 18 U.S.C. § 1623. At the second trial, Scott was found guilty of one count of conspiracy to convert property by a federal officer and to remove property to prevent seizure, in violation of 18 U.S.C. § 371; and one count of property conversion by a federal officer, in violation of 18 U.S.C. § 654.

Before sentencing, Scott's Presentence Report ("PSR") calculated his sentencing guidelines range at 188–235 months, based on enhancements

for Scott's perjury with respect to Peralta's case, as well as for his leadership role and abuse of public trust. Scott objected to the enhancements. The district court overruled Scott's objections but varied downward and sentenced him to 160 months in prison. The court separately explained that, even had it sustained Scott's objection to the perjury enhancement, it would have granted an upward variance and sentenced him to 160 months, given the "significant and far-reaching" damage Scott had "done to the administration of justice in the Eastern District of Louisiana."

Subsequently, it came to light that one of the jurors in the second trial, Juror 27, was a high school friend of Gemar's wife. The juror had gone to a high school dance with Gemar's wife, attended her and Gemar's wedding, and maintained sporadic communication with her on social media. Juror 27 had disclosed none of this during *voir dire*, however. Claiming juror bias, Gemar moved for a new trial under Federal Rule of Criminal Procedure 33, but Scott did not join the motion. Without holding an evidentiary hearing, the district court denied the motion, concluding that Gemar failed to show that Juror 27 was actually or impliedly biased.[5]

Scott now appeals, challenging his convictions and sentence on numerous grounds.

## II. Sufficiency of the Evidence

We begin with Scott's sufficiency challenges. We review such challenges *de novo* where, as here, a defendant "mov[ed] for acquittal in the district court." *United States v. Davis*, 53 F.4th 833, 842 (5th Cir. 2022).

_____

[5] Gemar subsequently appealed the district court's ruling. After oral argument in this case, another panel of our court held that the district court erred by failing to hold an evidentiary hearing to assess whether Juror 27 was biased against Gemar. *United States v. Gemar*, 65 F.4th 777, 781 (5th Cir. 2023). We discuss the effect of that decision on Scott's appeal in Part VI, *infra*.

"Our review, however, is highly deferential to the verdict, and, viewing the evidence in the light most favorable to the prosecution, we consider whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ibid.* (internal quotation marks omitted). We must accept "all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *United States v. Chon*, 713 F.3d 812, 818 (5th Cir. 2013) (quoting *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997)).

### A. Falsification of Forfeiture Documents

Scott's two document-falsification counts were supported by sufficient evidence.

Federal law prohibits anyone who "knowingly . . . falsifies, or makes a false entry in any record [or] document . . . with the intent to impede, obstruct, or influence the investigation or proper administration of any matter" within a U.S. agency's jurisdiction. 18 U.S.C. § 1519. Scott concedes that he submitted inaccurate forms relating to the seizure of Brown's truck. Nevertheless, he makes two arguments for why the evidence is insufficient to support his conviction.

First, Scott argues that his misrepresentations on the forms were immaterial to the DEA's administration. We disagree. The relevant statute, 18 U.S.C. § 1519, contains no "materiality" element. *See United States v. Moyer*, 674 F.3d 192, 207–08 (3d Cir. 2012) ("[M]ateriality is not an express element of § 1519."); *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012) ("[A] natural reading of the full text demonstrates that materiality would not be an element of § 1519." (cleaned up)). By contrast, other statutes do contain such an element. *Cf.* 18 U.S.C. § 1001(a) (prohibiting "any *materially* false, fictitious, or fraudulent statement" (emphasis added)). So, we reject Scott's challenge on that ground.

Second, Scott contends the evidence fails to show that he acted with the intent to impede, obstruct, or influence the DEA's administration. We again disagree. The prosecution produced evidence that Scott knowingly gave the DEA false information, concealing that he seized Brown's truck outside of his jurisdiction and that he instructed Brown to purchase the truck. An expert testified at trial that, had it known these details, the DEA would not have approved the seizure. Thus, a reasonable trier of fact could infer that Scott made such misrepresentations to obscure his violation of DEA policy, resulting in the agency's mistaken approval of the seizure and subsequent issuance of the truck to the Northshore Group. A rational jury could find that such actions were intended to improperly influence the DEA's administration.

## B. Perjury and Obstruction of Justice

Sufficient evidence also supported Scott's perjury and obstruction-of-justice convictions.

Federal law makes it a crime to "knowingly make[] any false material declaration" in any federal court proceeding, 18 U.S.C. § 1623(a), and, separately, penalizes anyone who "corruptly . . . obstructs, influences, or impedes any official proceeding," 18 U.S.C. § 1512(c)(2). Scott's convictions under these statutes were premised on his own false testimony at Peralta's trial and on his subornation of false statements that Brown saw Peralta at Martinez's drug-trafficking storefront. Scott argues that testimony from Brown, Peralta, and Martinez was the only evidence showing these statements were false—and all three of those men were arrested by Scott. He claims their testimony was therefore "incredible" and cannot support his convictions.

We disagree. The credibility of Brown, Peralta, and Martinez was a question for the jury. *See United States v. Kieffer*, 991 F.3d 630, 634 (5th Cir.

2021) ("[T]he jury decides credibility of witnesses, not the appellate court."). Furthermore, "[t]estimony is incredible as a matter of law only if 'it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature.'" *United States v. Perry*, 35 F.4th 293, 317 (5th Cir. 2022) (quoting *United States v. Booker*, 334 F.3d 406, 410 (5th Cir. 2003)). Scott does not even argue that the testimony of Brown, Peralta, or Martinez was "incredible" in that sense. Nor could he. Furthermore, Scott is wrong that his convictions were supported only by those three witnesses. Martinez's attorney and Newman also corroborated the government's charge that Scott suborned Brown and Martinez to perjure themselves.

## C. Conversion

Finally, we reject Scott's sufficiency challenge to his conversion convictions. Scott attacks those convictions because, he claims, the evidence failed to show he held the seized property for "his own use." *See* 18 U.S.C. § 654 (imposing criminal penalties when an officer "wrongfully converts to his own use" another's property). We disagree.

The record is replete with evidence from which a reasonable jury could infer that Scott used confiscated property for his own use. For example, Scott lifted money from confiscated wallets to fund his trip to Spain. And on numerous occasions, Scott skimmed thousands of dollars confiscated in drug busts. The jury could have rationally inferred that Scott kept at least some of this money for his own use. And we must accept all "reasonable inferences made by the trier of fact which tend to support the verdict." *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997). Moreover, Scott instructed Newman to destroy arrestees' property in an effort to conceal his own crimes. That destruction of property constituted a wrongful conversion that personally benefitted Scott. *See* Restatement (Second) of Torts

No. 21-30501

§ 226 cmt. C (Aᴍ. L. Iɴsᴛ. 1965) ("Where a chattel is intentionally destroyed, there is always so serious an interference with the right of another to control it as to amount to a conversion.").

### III. Rᴇғᴇʀᴇɴᴄᴇ ᴛᴏ Fᴏʀғᴇɪᴛᴜʀᴇ-Vᴇɴᴜᴇ Sᴛᴀᴛᴜᴛᴇ

Scott next argues the district court erred by not letting him refer to a federal statute governing the venue of forfeiture actions, 21 U.S.C. § 881(j). That statute relevantly provides that, when a defendant is "charged with a violation" that could form the basis for a forfeiture, the forfeiture proceeding "may be brought in the judicial district in which the defendant owning such property is found or in the judicial district in which the criminal prosecution is brought." 21 U.S.C. § 881(j).

Scott's convoluted argument for why this statute was relevant to his defense goes as follows: (1) Brown was eventually prosecuted in Louisiana for cocaine possession with the intent to distribute, so (2) the DEA *could* have seized Brown's truck in Louisiana under § 881, and so (3) Scott's false representations about the seizure did not "impede" the DEA's administration under 18 U.S.C. § 1519. The district court rejected this argument, ruling that § 881 was irrelevant to Scott's defense, a decision we review for clear abuse of discretion. *See United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007); *see also* Fᴇᴅ. R. Eᴠɪᴅ. 402 ("Irrelevant evidence is not admissible."). Scott contests that ruling and also argues that, by disallowing any reference to the venue statute, the district court violated his constitutional right to "present a complete defense." *See, e.g.*, *United States v. Wills*, 40 F.4th 330, 335 (5th Cir. 2022) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). We review constitutional issues *de novo*. *See United States v. Lockhart*, 844 F.3d 501, 509 (5th Cir. 2016).

Whatever the standard of review, Scott shows no reversible error as to § 881. The district court correctly ruled that referring to that statute would

have been irrelevant and misleading. Scott's fraudulent seizure of Brown's new truck occurred before Brown was charged in Louisiana. Thus, § 881 had no bearing on the proper venue for the forfeiture of Brown's truck.

But even if it did, the jury had ample evidence to find that Scott's misrepresentations impeded DEA administration. As noted, an expert testified that, had Scott not misled the DEA about his scheme to get Brown to buy a new truck and turn it over in Texas, the agency would not have authorized the seizure. So, even supposing error as to § 881, it would have been harmless. And as to Scott's constitutional claim, an "accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *United States v. Najera Jimenez*, 593 F.3d 391, 402 (5th Cir. 2010).

We therefore reject Scott's arguments regarding the venue statute.

## IV. Gemar's Proffer Statement

Scott also contends the Government violated its agreement with his co-defendant, Gemar, by introducing statements Gemar made at a proffer session. Scott also argues that introducing the proffer statement violated the Confrontation Clause.

Before trial, the Government agreed it would not use Gemar's proffer statements against him. One exception to the agreement, however, allowed use of the proffer "to rebut any evidence or arguments offered on [Gemar's] behalf" in a later judicial proceeding. In his proffer, Gemar stated that he witnessed Newman throw various phones into a swamp. But during his opening statement at trial, Gemar's counsel stated, "the possibility still exists and still remains that these [cellphones] . . . may be sitting in a local precinct in the lost and found." Finding that this statement contradicted Gemar's proffer, the district court allowed the prosecution to introduce the conflicting proffer statement in rebuttal.

No. 21-30501

We review the district court's interpretation of the proffer agreement *de novo* and its evidentiary rulings for abuse of discretion. *United States v. Sylvester*, 583 F.3d 285, 288 & n.4 (5th Cir. 2009); *United States v. Gonzalez*, 309 F.3d 882, 886 (5th Cir. 2002). We construe such agreements "like a contract, seeking to determine the defendant's 'reasonable understanding' of the agreement and construing ambiguity against the Government." *United States v. Escobedo*, 757 F.3d 229, 233 (5th Cir. 2014) (quoting *United States v. Farias*, 469 F.3d 393, 397 (5th Cir. 2006)). We have previously explained that rebuttal waivers, like the one here, may be triggered when "the defendant presents any evidence at trial that contradicts" his proffer. *Sylvester*, 583 F.3d at 291.

Scott argues that the opening statement did not trigger the proffer's exception because it merely pointed out the Government's lack of evidence. Scott relies on a Second Circuit case explaining that a defendant can "'draw the jury's attention to the lack of evidence' presented" without contradicting a proffer. *United States v. Rosemond*, 841 F.3d 95, 108 (2d Cir. 2016) (quoting *United States v. Oluwanisola*, 605 F.3d 124, 132 (2d Cir. 2010)). We disagree.

Gemar's opening statement did not merely allude to the Government's lack of evidence but asserted a new factual theory—specifically, that the phones might still be at the police station instead of in a bayou. That flatly contradicts Gemar's proffer. It does not matter that the new theory was couched in terms of a "possibility." Accepting that would let defendants gut the waiver exceptions in proffer agreements with verbal tricks.[6]

_____

[6] Moreover, the Second Circuit's *Rosemond* decision (which does not bind us, in any event) is distinguishable. There, the court found that the defendant did not trigger the proffer waiver because his argument "suggests no new facts and injects no alternate version of events inconsistent with the proffer statements." *Rosemond*, 841 F.3d at 111.

11

Separately, Scott contends that introducing Gemar's proffer statement violates his *Bruton* rights under the Confrontation Clause. *See Bruton v. United States*, 391 U.S. 123 (1968). A *Bruton* problem arises "where one defendant confesses out of court and incriminates a co-defendant without [himself] testifying at their joint trial." *United States v. Reed*, 908 F.3d 102, 118 (5th Cir. 2018) (quoting *United States v. Gibson*, 875 F.3d 179, 194 (5th Cir. 2017)). The problem can be cured by a limiting instruction, *Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987), but not if the out-of-court statement "powerfully incriminate[s]" the co-defendant. *Reed*, 908 F.3d at 118 (quoting *Bruton*, 391 U.S. at 135–36).

We disagree that introducing Gemar's proffer statement violated *Bruton*. "[T]he [Supreme] Court has since clarified that *Bruton* applies only to facially inculpatory statements—and not to statements that only become inculpatory 'when linked with evidence later introduced at trial.'" *Reed*, 908 F.3d at 118 (quoting *Richardson*, 481 U.S. at 208). Gemar's proffer statement mentioned only that Newman threw the phones into a swamp. It did not mention Scott and so did not facially inculpate him. *See Reed*, 908 F.3d at 119. Scott makes no other argument as to why the statement was "powerfully incriminating." *Id.* at 118. And any Confrontation Clause concerns were cured by the district court's instruction that the statement should be considered solely against Gemar.

## V. Prosecutorial Misconduct

Scott next argues that the prosecutor made improper comments during closing arguments. We assess such a claim with a two-step analysis. *United States v. McCann*, 613 F.3d 486, 494–95 (5th Cir. 2010). First, we decide *de novo* "whether the prosecutor made an improper remark." *United States v. Barnes*, 979 F.3d 283, 299 (5th Cir. 2020) (cleaned up). If yes, we then ask whether the remark affected the defendant's substantial rights by

assessing (1) its prejudicial effect, (2) "the efficacy of any cautionary instruction by the judge," and (3) "the strength of the evidence supporting the conviction." *Ibid.* (quoting *United States v. Bennett*, 874 F.3d 236, 254 (5th Cir. 2017)). Under step two we review for abuse of discretion. *McCann*, 613 F.3d at 494.

During closing argument, the prosecutor told the jury that the "government has proven its case beyond a reasonable doubt on each and every count. It is your duty to find the defendant guilty." Scott's lawyer objected, claiming the prosecutor improperly told the jury it must convict. The court agreed to counsel's request to give a curative instruction, clarifying the jury had no duty to render a particular verdict but only to consider the evidence objectively. Following the verdict, Scott moved for new trial. The court denied the motion, ruling that the prosecutor's comment was proper and, alternatively, that the corrective instruction cured any prejudice. Scott contends the court erred on both counts.

We first ask whether the remark was proper, "examining the context in which [it was] made." *United States v. Garcia*, 887 F.3d 205, 209 (5th Cir. 2018). It was. The prosecutor told the jury to base its verdict on the evidence and apply the law regardless of the consequences. Only then did the prosecutor make the challenged remark. Viewed in this context, the prosecutor's statement merely sums up the jury's task and does not, as Scott suggests, tell the jury to convict regardless of its view of the evidence. *See United States v. Gomez*, 725 F.3d 1121, 1131 (9th Cir. 2013) ("[I]t is proper to tell the jury that it is its duty to convict if it concludes that the defendant is guilty beyond a reasonable doubt.").

Even if the remark were improper, Scott would still lose. He makes no attempt to explain why the remark substantially affected his rights, nor why the court's instruction failed to cure any prejudice. Giving great weight to the

district court's view that there was no prejudice, *Garcia*, 887 F.3d at 211, we find no reversible error.

## VI. Juror Bias

Scott next argues that the district court erred by denying Gemar's motion for a new trial based on Juror 27's alleged bias, without first holding an evidentiary hearing. Recall that Juror 27 failed to reveal his prior social contacts with Gemar's wife.

"A criminal defendant has the right to a trial by an impartial jury secured by the Sixth and Fourteenth Amendments." *United States v. Dejean*, 988 F.3d 813, 816 (5th Cir. 2021). Typically, a court will address a defendant's claim that a juror was biased "in a hearing where the judge examines the juror and obtains assurances of the juror's impartiality." *Buckner v. Davis*, 945 F.3d 906, 910 (5th Cir. 2019) (quoting *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009)). If a district court chooses to forgo such a hearing, we review that decision for an abuse of discretion. *United States v. Thomas*, 627 F.3d 146, 161 (5th Cir. 2010).

Recently, a panel of our court held in a separate appeal that the district court erred by failing to hold an evidentiary hearing to assess whether Juror 27 was biased against Gemar. *See United States v. Gemar*, 65 F.4th 777, 781 (5th Cir. 2023) ("Although not every claim of actual bias on behalf of a juror militates a hearing, the district court here abused its discretion by ruling on [Gemar's] motion for a new trial without holding an evidentiary hearing."). The panel remanded for the district court "to hold an evidentiary hearing into Juror 27's possible biases and any other pertinent issues." *Ibid.*

Scott argues that he should likewise benefit from the separate panel's holding with respect to Gemar and Juror 27. The Government responds that Gemar's allegation of juror bias does not relate to Scott, though it recognizes that Scott's juror-bias claim factually overlaps with Gemar's. For the

following reasons, we conclude that Scott's conviction is not affected by the *Gemar* panel's ruling or by any other issue concerning Juror 27.

First, unlike Gemar, Scott did not file a motion for a new trial under Federal Rule of Criminal Procedure 33 based on Juror 27's alleged bias. *See Gemar*, 65 F.4th at 779 ("Based on this information [about Juror 27], Gemar moved for a new trial under Federal Rule of Criminal Procedure 33."). Nor did Scott join Gemar's motion. While non-jurisdictional, a Rule 33 motion for new trial is nonetheless a "claim-processing rule . . . that is admittedly inflexible." *Eberhart v. United States*, 546 U.S. 12, 19 (2005). Scott may file a Rule 33 motion within three years after the August 2021 guilty verdict. Fed. R. Crim. P. 33(b)(1). Because he has not done so, there is no ruling by the district court before us that pertains to Scott. *See* 3 Charles Alan Wright et al., Federal Practice and Procedure (Criminal) § 581 (5th ed. 2023) ("The court may grant a new trial only on the motion of a defendant. . . . When co-defendants move for a new trial under Rule 33, the court's decision to grant or deny the motion is specific to each defendant."); *United States v. Brown*, 587 F.2d 187, 189 (5th Cir. 1979) ("A district court . . . is powerless to order a new trial except on the motion of the defendant.").

Second, even if we could review this issue, Scott's complaint regarding Juror 27 is subject to plain error review because he failed to raise this issue before the district court. *United States v. Aderholt*, 87 F.3d 740, 743 (5th Cir. 1996). Scott must therefore show clear or obvious error that affects his substantial rights. *United States v. Stoglin*, 34 F.4th 415, 417 (5th Cir. 2022) (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009)). Even then, we should exercise our discretion to correct the error "only if it seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Ibid.* (internal quotation marks and citation omitted). Scott cannot make this showing. Principally, he fails to explain how Juror 27's relationship with

No. 21-30501

Gemar's wife impaired that juror's ability to impartially assess the evidence against Scott.

## VII. Sentencing

The district court determined Scott's total offense level was 36 with a guidelines range of 188–235 months. But the court varied downward and sentenced Scott to 160 months in prison. He contests that sentence, arguing the court erred in calculating his offense level by incorrectly: (1) estimating the loss amount; (2) applying a perjury cross-reference; and (3) adding two enhancements for his leadership role and for abusing a position of public trust. We consider each argument in turn.

"Though we review a sentence for abuse of discretion, we review the district court's application of the guidelines *de novo* and its findings of fact at sentencing for clear error." *United States v. Klein*, 543 F.3d 206, 213 (5th Cir. 2008) (internal citation omitted).

### A. Loss Calculation

We first consider Scott's challenge to the loss calculation, which is "a factual finding reviewed for clear error." *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012). Moreover, because the district court maintains a "unique position to assess the applicable loss," we must confirm its calculation if it is a "reasonable estimate of the loss." *Ibid.* (quoting U.S. Sent'g Guidelines Manual § 2B1.1 cmt. n.3(C)).[7] According to Scott's Presentence Report ("PSR"), his property conversion resulted in an actual loss of at least $98,000.

---

[7] All citations in this Part are to the United States Sentencing Guidelines unless otherwise noted.

No. 21-30501

The district court agreed with the PSR but only after independently confirming its loss estimate. The court explained that it relied on trial evidence showing Scott converted $53,580 in cash, plus cell phones and jewelry. Additionally, the court found that Scott stole varying amounts from arrestees' wallets (ranging from a few-hundred to a few-thousand dollars), about three-to-four times a year, for approximately eight years. Adding those numbers up, the court found Scott converted at least $98,000. Accordingly, the court imposed an eight-level increase to Scott's offense level. *See* § 2B1.1 (increasing offense level by eight for losses between $95,000 and $150,000).

Scott challenges this loss calculation on two grounds. First, he argues that the district court unreasonably calculated losses by relying on impeached witness testimony. We disagree. The complained-of testimony is the same testimony that supports his convictions, and so we find the testimony "bears sufficient indicia of reliability to support" the district court's calculations. *United States v. Solis*, 299 F.3d 420, 454–55 (5th Cir. 2002) (internal quotation marks omitted).

Second, Scott points to discrepancies between the PSR's calculations and the district court's, noting, for example, that the PSR estimated Scott converted $80,000 from drug proceeds while the district court estimated $76,000. We again disagree. The district court backs up its math with trial testimony, and Scott does not explain why relying on this testimony was clearly erroneous.

## B. Perjury Cross-Reference

Scott next argues that the district court incorrectly applied the perjury cross-reference in § 2J1.3(c)(1), a ruling we review *de novo*. *United States v. Rankin*, 487 F.3d 229, 231 (5th Cir. 2007).

Perjury has a base offense level of 14, *see* § 2J1.3(a), but that level rises if the perjury is "in respect to a criminal offense." § 2J1.3(c)(1). In that case,

17

the guidelines direct the court to "apply § 2X3.1 (Accessory After the Fact)," if doing so would increase the offense level. *Ibid.* The cross-referenced section, § 2X3.1, sets the base offense level "6 levels lower than the offense level for the underlying offense," with a maximum of 30. *See* § 2X3.1(a). The upshot, then, is that the "the guidelines . . . borrow the formula in § 2X3.1 to treat a defendant who has perjured himself in relation to a criminal offense as if he was convicted of being an accessory." *United States v. Martinez*, 106 F.3d 620, 621 (5th Cir. 1997). The steeper sentence is justified by "the potential of the perjury to derail or miscarry a judicial or similar proceeding directed to another crime." *United States v. Bova*, 350 F.3d 224, 230 (1st Cir. 2003).

The district court applied this perjury cross-reference based on Scott's false testimony that convicted Peralta of drug trafficking. The court concluded that Scott's perjury was "in respect to a criminal offense," namely Peralta's drug offense. Because that crime carried an offense level of 38, Scott's level was calculated as 30, the maximum under § 2X3.1.

On appeal, Scott principally argues that the cross-reference applies only to perjury that seeks to "avoid punishment" for the defendant's own crime or to help someone else avoid punishment. It does not apply here, Scott contends, because he perjured himself in order to *convict* Peralta, not absolve him. This argument is meritless. But even if it had merit, any error in applying the cross-reference was harmless.

Scott's perjury was plainly "in respect to" Peralta's drug offense under § 2J1.3(c)(1). Scott testified—first at a suppression hearing and then during Peralta's trial—that Brown positively identified Peralta as Martinez's heroin source. But Scott knew that was false; Scott himself had fed Peralta's photo to Brown, who had never seen Peralta. Scott's perjury led directly to Peralta's conviction. But when the lie came to light, the conviction was

vacated. And even though the Government believed it had other evidence implicating Peralta in heroin trafficking, it moved to dismiss the charges because Scott's perjury had irreparably contaminated the case.

As noted, Scott argues the cross-reference does not apply because his perjury sought to aid, not hinder, Peralta's prosecution. The text contains no such limitation, however. It speaks broadly of perjury "in respect to" an offense, and it is undisputed that Scott's perjury resulted in Peralta's conviction for conspiring to distribute drugs.[8] Furthermore, the perjury scuttled Peralta's prosecution, which is exactly the damage to the justice system the cross-reference seeks to punish. *See, e.g.*, *United States v. Suleiman*, 208 F.3d 32, 39 (2d Cir. 2000) (explaining that "the purpose of the 'in respect to' enhancement is to treat more severely perjuries that risk an incomplete or an inaccurate investigation or trial of a criminal offense").

We therefore decline to read Scott's proposed limit into the "plain meaning" of § 2J1.3(c)(1). *Martinez*, 106 F.3d at 622. Nothing in the text suggests the cross-reference applies only when the perjurer seeks to exculpate himself or another person. *See, e.g.*, *Bova*, 350 F.3d at 230 (suggesting the cross-reference is even better suited in "the case of perjury in a criminal trial to *inculpate* an innocent third party rather than to exculpate a confederate"). All the guideline requires is that the perjury be "in respect to" a criminal offense.  Scott's perjury plainly was.[9]

---

[8] Scott argues that our *Martinez* decision requires the perjury to be "entwined and enmeshed" with the underlying offense. We disagree. *Martinez* was merely quoting the district court's fact finding, *see* 106 F.3d at 622, not proposing the phrase as equivalent to the guideline's phrase "in respect to."

[9] Scott points to the similar cross-reference for obstruction of justice. *See* § 2J1.2(c) (cross-referencing § 2X3.1). The commentary justifies that cross-reference because "the conduct covered by this guideline is frequently part of an effort to *avoid punishment* for an

No. 21-30501

Scott also suggests it matters that he was not an accessory to Peralta's drug-trafficking activities. He is mistaken. For the cross-reference to apply, the defendant need not have been an accessory to the crime he lied about. *See Martinez*, 106 F.3d at 621 (explaining that "§ 2X3.1 should not be interpreted to require a conviction on the underlying offense for the cross-reference to apply"). It is enough that he "knew or had reason to know, at the time of his perjury, that his [perjury] concerned such a criminal offense." *Ibid.* (quoting *United States v. Rude*, 88 F.3d 1538, 1543 (9th Cir. 1996) (alteration in original)); *see also United States v. Arias*, 253 F.3d 453, 459–60 (9th Cir. 2001) ("Using the cross reference does not equate to a sentence for the underlying offense but is merely a measure or point of reference for the severity of offenses involving the administration of justice.") (cleaned up).[10]

Alternatively, any error in applying the cross-reference was harmless. *See, e.g.*, *United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012) (declining to vacate and remand if a guidelines error was harmless). The Government meets its "heavy burden" of showing harmless error by "convincingly demonstrat[ing] both (1) that the district court would have

---

offense that the defendant has committed or to assist another person to *escape punishment* for an offense." *Id.* cmt. (bckg'd) (emphases added). This does not help Scott. Even assuming the obstruction commentary applies to perjury, it says only that such conduct "frequently" involves trying to avoid punishment. Perhaps so, but "frequently" does not mean "always." Scott's perjury, despite the fact that it sought to inculpate Peralta, was nonetheless "in respect to" a criminal offense under § 2J1.3(c).

[10] Scott also suggests that instead of § 2J1.3(c), the district court should have applied § 2J1.3(b)(2), which imposes a smaller three-level enhancement when the "perjury . . . resulted in substantial interference with the administration of justice." We disagree. Even assuming Scott's perjury could fall under § 2J1.2(b)(2), it could also fall under the more specific § 2J1.3(c). And the latter provision explicitly applies "if the resulting offense level is greater than that determined above." § 2J1.3(c). That is the case here: § 2J1.3(c) applies because it yields a higher offense level than § 2J1.3(b)(2) (30 versus 17).

imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing.'" *United States v. Alfaro*, 30 F.4th 514, 520–21 (5th Cir. 2022) (quoting *United States v. Redmond*, 965 F.3d 416, 420 (5th Cir. 2020)).

The Government meets that burden here. First, the district court unequivocally stated that, even if the cross-reference did not apply, it "would have granted an upward variance resulting in the same sentence of 160 months." *See United States v. Castro-Alfonso*, 841 F.3d 292, 298 (5th Cir. 2016) (holding that such a "firm, plain, and clear" statement shows harmless error). Second, the court amply explained why it would have imposed the same sentence:

> The damage done to the administration of justice in the Eastern District of Louisiana through the actions of Mr. Scott is significant and far-reaching. Multiple cases required dismissal, including the *Peralta* matter. In many cases, charges were drastically reduced and in others plea agreements were reached where defendants served only small fractions of the time warranted. Many cases required recusal of the office. Morale in the United States Attorney's Office was and still remains impacted. Law enforcement officers and those of us that serve the public trust must diligently follow the rule of law.

Because "the record reflects that the district court would have imposed the same sentence for the same reasons," any error in applying the cross-reference was harmless. *United States v. Halverson*, 897 F.3d 645, 652 (5th Cir. 2018).

### C. Leadership and Abuse-of-Trust Enhancements

Scott also challenges the sentencing enhancements for his leadership role and his abuse of public trust in securing false testimony against Peralta.

No. 21-30501

The guidelines adjust a defendant's offense level "based upon the role [he] played in committing the offense." *United States v. Partida*, 385 F.3d 546, 566 (5th Cir. 2004). Here, the district court added two levels to account for Scott's role as "an organizer, leader, manager, or supervisor" in suborning Brown and Martinez's perjury. *See* § 3B1.1(c). It added two more levels because it found Scott "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." § 3B1.3.

Scott contests both enhancements by pointing to § 1B1.5(c). That subsection provides: "If the offense level is determined by a reference to another guideline under subsection (a) or (b)(1) above, the adjustments in Chapter Three . . . also are determined in respect to the referenced offense guideline, except as otherwise expressly provided." § 1B1.5(c).[11] Because his offense level was set by reference to Peralta's offense (under the § 2J1.3(c) cross-reference), Scott argues that the district court had to evaluate his enhancements only in reference to his role in Peralta's drug-trafficking. In other words, Scott contends he could receive the enhancements only if he had a leadership role or abused his public trust in relation to Peralta's underlying crime, rather his own offenses of conviction (perjury and obstruction of justice).

There is force in Scott's argument because the Chapter Three adjustments at issue here do not mention § 1B1.5(c) or otherwise explain how they apply in the event of a cross-reference. *See, e.g.*, *United States v. Arellanes-Portillo*, 34 F.4th 1132, 1138 (10th Cir. 2022) (explaining that "§ 1B1.5(c) generally instructs courts to calculate the Chapter Three

---

[11] Subsections (a) and (b)(1) generally provide that references to another guideline or an offense level from another guideline include the entire referenced guideline, unless otherwise specified.

adjustments using relevant conduct from the offense associated with the incorporated guideline . . . '*except as otherwise expressly provided*'") (quoting § 1B1.5(c)); *United States v. Salgado*, 745 F.3d 1135, 1138 (11th Cir. 2014) (finding that § 2S1.1(a)(1) is such an "express" exception because it explicitly applies "[n]otwithstanding § 1B1.5(c)"); *United States v. Anderson*, 526 F.3d 319, 327 (6th Cir. 2008) (same).

We need not resolve the issue, however. Even if the district court erred in applying these two enhancements, the error was harmless. As discussed, the district court carefully explained that it would have imposed the same 160-month sentence for the same reasons even if it erred in calculating Scott's offense level.

## VIII. Conclusion

Scott's conviction and sentence are AFFIRMED.